IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RYAN S., by and through his Parents,      :
George S. and Christine S., and           :
GEORGE S. and CHRISTINE S.,               :
individually, of Glenmoore, Pa 19343      :
                                          :
                                          :        Civil Action
            Plaintiffs                    :
                                          :
v.                                        :        No.
                                          :
DOWNINGTOWN AREA                          :
SCHOOL DISTRICT                           :
540 Trestle Place                         :
Downingtown, Pa 19335                     :
                                          :
            Defendant                     :

## COMPLAINT

### I.    Preliminary Statement

1.      This action is brought by Ryan S. ("Ryan"), a minor child with disabilities, by and through his parents, George S. and Christine S., and George S. and Christine S., individually, ("Parents," and together with Ryan, the "Plaintiffs" or the "Family"), against Defendant, Downingtown Area School District (the "School District" or "District"), because the District failed to offer and provide Ryan the special education supports he needed, forcing his Family to place him in an appropriate private school for his safety and to meet his educational needs.

2.      Ryan is a thirteen-year-old with disabilities including Autism, Generalized Anxiety Disorder, Unspecified Depressive Disorder, and Attention Deficit Hyperactivity Disorder ("ADHD").

3.      He attended the District's schools from kindergarten until the middle of sixth grade.

4.      Ryan deteriorated in the large school environment and general education classes

1

with minimal special education support provided by the District to the point of engaging in suicidal ideation and making suicidal statements.

5.      When the District continued to offer a minimal program which failed to address Ryan's rapidly worsening social and emotional functioning, Ryan's Family was forced to unilaterally place him in a private school that could meet his needs.

6.      In the fall of sixth grade, Ryan began attending The Concept School ("TCS"), a small school that provides Ryan with individualized instruction and small class sizes throughout his day.

7.      Ryan and his Family immediately saw significant educational progress at TCS.

8.      The Family's claims are brought under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, et seq.; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, et seq.; the federal and state implementing regulations of the foregoing statutes; and Chapters 14 and 15 of the Pennsylvania Code.

9.      After fully and independently considering the entire record and the failures of the District to provide Ryan with a Free Appropriate Public Education ("FAPE"), this Court should determine that the District violated the foregoing statutes and reverse the Hearing Officer's decision. Specifically, this Court should (1) award the Family compensatory education from October 24, 2020 to November 15, 2021; (2) award the Family reimbursement for the tuition, transportation, and costs for Ryan's attendance at TCS during the 2021-22 and 2022-23 school years; (3) award the Family reimbursement for an independent educational evaluation; (4) award reasonable attorneys' fees and costs to Ryan's Family; and (5) award any other relief this Court deems just.

2

## II.    Parties

10.    Ryan was born in 2010 and is an eligible student with disabilities under IDEA. He is also a Protected Handicapped Student under Section 504 and the ADA.

11.    Ryan has resided in the District at all times at issue.

12.    George S. and Christine S. are Ryan's parents. At all times relevant to this action, they have resided with Ryan in Glenmoore, Pennsylvania, within the geographical boundaries of the District.

13.    The District is located at 504 Trestle Place, Downingtown, Pennsylvania, 19335. The District is the recipient of several sources of federal funds and is an educational agency designated by Pennsylvania law and the Pennsylvania Department of Education for the provision of educational services to individuals residing within its boundaries. Such services include those mandated under IDEA and Section 504. 22 Pa. Code Chapters 14 and 15; 24 P.S. Chapter 13.

## III.    Procedural History

14.    On October 24, 2022, the Family filed an administrative due process complaint with the Pennsylvania Department of Education's Office for Dispute Resolution.

15.    On February 17, 2023 and April 3, 2023, Pennsylvania Hearing Officer James Gerl (the "Hearing Officer") conducted a due process hearing.

16.    At the hearing, the Hearing Officer shortened time allotments for the Family's counsel's examination of certain witnesses and did not similarly impose such limitations on the District's counsel.

17.    On May 25, 2023, the Hearing Officer issued a written decision denying the relief requested by the Family.

3

## IV.   Jurisdiction and Venue

18.     This Court has original jurisdiction over this appeal because this case raises federal questions under the IDEA, Section 504, and the ADA. 28 U.S.C. § 1331.

19.     Plaintiffs exhausted their administrative remedies where required under 20 U.S.C. § 1415(i), having timely pursued a special education due process hearing. *See* 20 U.S.C. § 1415(i)(2)(A).

20.     The Family's claims and remedies are authorized by 20 U.S.C. § 1415; 29 U.S.C. § 794(a); and 28 U.S.C. §§ 2201 and 2202. These statutes provide for declaratory and equitable relief and any further relief that this Court deems necessary and proper.

21.     All of the Defendant's complained-of actions have taken place within the jurisdiction of the United States District Court for the Eastern District of Pennsylvania. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391.

## V.   Standard of Review

22.     This Court is required to undertake a fully independent review of the records and the Hearing Officer's decision. *Rowley v. Board of Educ.*, 458 U.S. 176, 206-07, 102 S. Ct. 3034, 3051 (1982). This review is far broader and more searching than a district court's review of other administrative matters. Judicial review in IDEA cases is called "modified de novo" review because it "differs substantively from judicial review in other agency actions, in which the courts are generally confined to the administrative record and are held to a highly deferential standard of review." *Susan N. v. Wilson School District*, 70 F.3d 751, 757 (3d Cir. 1995).

23.     In conducting this independent review, district courts: (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court

4

determines is appropriate. 20 U.S.C. § 1415(i)(2)(B).

24.     In conducting a modified de novo review, district courts give "due weight" to the factual findings of the administrative agency. *S.H. v. School District of Newark*, 336 F.3d 260, 269 (3d Cir. 2003). "Due weight" means that although the district courts must consider the administrative fact findings, the courts are free to reject such findings. *Id.* at 269-70. Thus, when reviewing an administrative proceeding in an IDEA case, the district court should "defer to the hearing officer's factual findings," unless it can point to contrary non-testimonial extrinsic evidence in the record. *Carlisle Area School District v. Scott P.*, 62 F.3d 520, 529 (3d Cir. 1995). If the Court does not accept these factual findings, it needs to explain why. *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004).

25.     The modified de novo review under the IDEA does not apply to Section 504 and ADA claims. *K.N. v. Gloucester City Bd. Of Edu.*, 379 F. Supp. 3d 334, 344 (D.N.J. 2019). Thus, a federal district court applies a de novo standard of review for Section 504 and ADA claims, as opposed to the modified de novo standard of review that the Court will apply for the IDEA claims. *Id.* (*citing T.F. v. Fox Chapel Area Sch. Dist.*, 589 F.App'x 594, 598 (3d Cir. 2014)).

**VI.    Applicable Law**

    **A.    IDEA requires that a school district comprehensively evaluate students with disabilities to determine their educational needs.**

26.     According to IDEA, school districts must, at a minimum, evaluate students with disabilities at least every three years, commonly known as a "triennial evaluation." 34 C.F.R. § 300.303(b)(2).

27.     In such evaluations, a school district must use a variety of assessment strategies to gather relevant information about the child and must assess the child "in all areas related to the suspected disability." 34 C.F.R. § 300.304(c)(4).

5

28.     The public agency must ensure that a student's "evaluation is sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.304(c)(6).

**B.     After the school district identifies a student's needs in an evaluation report, the IEP Team must use the report to create an IEP and offer a student a Free Appropriate Public Education.**

29.     At the beginning of each school year, a school district is required to develop an IEP that provides a Free Appropriate Public Education ("FAPE") for each child with a disability who resides within its jurisdiction. 20 U.S.C. § 1414(d)(2)(A).

30.     Indeed, IDEA's purpose is to ensure that "all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).

31.     Because a school district's obligation to offer FAPE derives from the child's residency in the community, even disabled students in private schools must be offered an IEP, and enrollment is not required to trigger the mandatory obligation to provide an offer of FAPE. *Shane T. v. Carbondale Area School District*, 2017 WL 4314555 at (M.D. Pa. September 28, 2017); *see also I.H. v. Cumberland Valley School Dist.*, 842 F. Supp. 2d 762, 772-73 (E.D. Pa. 2012) ("requiring enrollment as a prerequisite to obtaining an IEP . . . would be at odds with the 'remedial nature' of the IDEA").

32.     If a resident child is attending a privately-funded program, the child still has the right to an offer of a FAPE via a thorough evaluation and a proposed IEP. *Shane T., supra*, 2017 WL 4314555 at *9.

6

33.     The IDEA provides that an IEP team, which includes both school officials and the child's parents, must develop an appropriate educational program and placement for each eligible child through a written IEP. A two-pronged analysis applies in reviewing a school district's IEP development under the IDEA: (1) whether the District complied with the procedures set forth in the IDEA; and (2) whether the IEP developed through the IDEA's procedures is reasonably calculated to enable the child to receive meaningful educational benefit. *Board of Educ. v. Rowley*, 458 U.S. 176, 206-07, 102 S.Ct. 3034 (1982); *see also Endrew F. v. Douglas County School District RE-1*, 580 U.S. 386, 137 S. Ct. 988, 999 (2017).

34.     The IDEA requires that every IEP include, *inter alia,* a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child; a statement of the program modifications or supports for school personnel that will be provided to enable the child to advance appropriately toward attaining the annual goals, to be involved in and make progress in the general education curriculum; and an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in activities. 20 U.S.C. §1414(d); 34 C.F.R. § 300.320.

35.     The United States Supreme Court in its decision in *Endrew F., supra,* emphasized that IDEA requires more than a program reasonably calculated to allow a student to make "some progress." *Endrew F.,* 137 S. Ct. at 997, 1000-01. Instead, IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 999.

36.     In addition, an "educational program must be appropriately ambitious in light of his circumstances," as minimal "progress from year to year can hardly be said to have been offered

7

an education at all. The goals may differ, but every child should have the chance to meet challeng-ing objectives." *Id.* at 999-1000.

37.    The progress standard set forth in *Endrew F.* is therefore consistent with, and ex-pands upon, the standard that has been applied for many years in this Circuit, requiring that a student must receive a program that is reasonably designed to allow a student to make *meaningful* educational progress and achieve "significant learning." *K.D. v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 254 (3d Cir. 2018).

38.    Furthermore, it is well-settled that "education" extends beyond discrete academic skills, and includes the social, emotional, behavioral, and physical progress necessary to move the child toward meaningful independence and self-sufficiency consistent with the child's cognitive potential. *M.C. v. Central Regional School District*, 81 F.3d 389, 393-94 (3d Cir. 1996); *see also Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 181-82 (3d Cir. 1988).

C.    **Under both IDEA and Section 504, compensatory education is an available remedy for a District's denial of FAPE to a student.**

39.    When a District fails to provide FAPE under both the IDEA and Section 504, it is well-settled that compensatory education is an available remedy. *Lester H. v. Gilhool*, 916 F.2d 865 (3d Cir. 1990); *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 250 n.11 (3d Cir. 1999); *M.C.*, *supra*, 81 F.3d at 397.

40.    Compensatory education is designed to provide eligible students with the services they should have received pursuant to a FAPE. *Lester H.*, *supra*, 916 F.2d at 873.

41.    Where a school district's failures deprive the student of the opportunity to benefit from an IEP, then the violation results in a substantive violation of IDEA and entitles the student to compensatory education. *Jana K. v. Annville-Cleona Sch. Dist.*, 39 F.Supp.3d 584, 603 (M.D. Pa. 2014).

8

42.     The amount of compensatory education is calculated by finding the period of dep-

rivation of special education services and excluding the time reasonably required for the school

district to rectify the problem. *M.C.*, 81 F.3d at 397. Thus, compensatory education is an in-kind

remedy intended to provide educational services denied to a child by a school district's failure to

provide a FAPE. *Lester H.*, 916 F.2d at 873.

**D.      A school district is required to reimburse a parent for private school tuition
where the district failed to offer an appropriate IEP and where the private
school placement was appropriate.**

43.     The Supreme Court established that when a school district's IEP is inappropriate,

and when the parents obtain and pay for an appropriate private school program along with other

equitable considerations, the school district must fund the private program provided by the child's

parents. *School Comm. of Burlington v. Dept. of Educ. of Massachusetts*, 471 U.S. 359, 370-71,

105 S.Ct. 1996 (1985); *see also Florence County School Dist. v. Carter*, 510 U.S. 7, 14, 114 S.Ct.

361 (1993); 34 C.F.R. § 300.148(c).

44.     As such, under IDEA, parents who disagree with their child's program and place-

ment at a school district may unilaterally enroll their child in an appropriate out-of-district place-

ment and obtain tuition reimbursement where a court determines that the school district has not

offered an appropriate education for the child. *Shore Reg'l High School Bd. of Educ.*, 381 F.3d at

198-99.

45.     Under the test for tuition reimbursement from *Burlington, supra*, a court's first step

is to determine whether the school district offered the student FAPE through an appropriate IEP.

*Burlington*, 471 U.S. at 369-70.

46.     The private school does not need to be the least restrictive environment, nor is it

held to the same FAPE standards as the school district. *Florence County, supra*, 510 U.S. at 13-

9

14.

47.     Once a court determines a placement is appropriate, the court may still reduce the

tuition reimbursement if the court finds that an equitable reduction is necessary after examining

(1) whether the parents informed the school district of their intent to remove the student, (2)

whether the parents made their child unavailable for a reevaluation, or (3) whether the parents

otherwise acted unreasonably. 34 CFR § 300.148(d).

E.     **A student may also bring a tuition reimbursement claim under Section 504
       and the ADA.**

48.     Under Section 504, recipients of federal funds such as the District are required to

"provide a free appropriate public education to each qualified handicapped person who is in the

recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. §

104.33(a). The term "appropriate education" is defined as "the provision of regular or special ed-

ucation and related aids and services that (i) are designed to meet individual educational needs of

the handicapped persons as adequately as the needs of non-handicapped persons are met and (ii)

are based on adherence to the procedures that satisfy the requirements of Section 104.34, 104.35,

and 104.36." 34 C.F.R. § 104.33(b).

49.     Similar to IDEA, Section 504 and its regulations require the identification of all

children with disabilities and the provision of appropriate educational services. 29 U.S.C.§ 794;

*see also* 34 C.F.R. § 104.1 *et seq.*

50.     Section 504 requires that "a public elementary or secondary education program

shall annually undertake to identify and locate every qualified handicapped person residing in the

recipient's jurisdiction who is not receiving a public education and take appropriate steps to notify

handicapped persons and their parents or guardians of the recipient's duty under this subpart."

34 C.F.R. § 104.32; *see also Ridgewood,* 172 F.3d at 253.

10

51.     "When a state fails to provide a disabled child with a free and appropriate education, it violates the IDEA. However, it also violates [Section 504] because it is denying a disabled child a guaranteed education merely because of the child's disability. It is the denial of an education that is guaranteed to all children that forms the basis of the claim." *Andrew M. v. Delaware Cty. Office of Mental Health and Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007).

52.     Thus, the substantive requirements of Section 504 in the education context are largely, but not entirely, equivalent to the requirements under the IDEA. *James S. v. School Dist. of Phila.*, 559 F. Supp.2d 600, 620 (E.D. Pa. 2008).

53.     A school may violate Section 504 independent of any violations of IDEA. *See Lauren G. v. West Chester Area School Dist.*, 906 F. Supp. 2d 375 (E.D. Pa. 2012) (granting tuition reimbursement for school district's failure to provide FAPE under Section 504 during period for which no relief was granted under IDEA); *see also Molly L. v. Lower Merion School Dist.*, 194 F.Supp.2d 422, 429 n.7 (E.D. Pa. 2002) ("Tuition reimbursement has been awarded in cases arising under both the Rehabilitation Act and IDEA.").

54.     To establish a violation of Section 504, a plaintiff must prove that: (1) he is "disabled" as defined by the Act; (2) he is "otherwise qualified" to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school. *Ridgewood*, 172 F.3d at 253.

55.     The ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." The Third Circuit has held that the ADA "extends the nondiscrimination rule of

11

[Section 504] to services provided by any 'public entity' (without regard to whether the entity is a recipient of federal funds)." *Jeremy H. v. Mount Lebanon School Dist.*, 95 F.3d 272, 279 (3d Cir. 1996). That court held that "the remedies, procedures, and rights" applicable to Section 504 claims are the same as those under the ADA. *Id.*; *see also Tereance D. v. School Dist. of Philadelphia*, 548 F. Supp.2d 162, 169-70 (E.D. Pa. 2008) (applying same analysis to claims under ADA as to claims under Section 504).

56.     The IDEA, Section 504, and the ADA all permit the recovery of reasonable attorneys' fees by parents who prevail in an action or proceeding thereunder. 20 U.S.C. § 1415; 42 U.S.C. § 12205; 34 C.F.R. § 300.517; 29 U.S.C. § 794a.

## VII.   **Factual History**

57.     Ryan is a student with Autism, Generalized Anxiety Disorder, Unspecified Depressive Disorder, and ADHD.

58.     The school years at issue are Ryan's fifth (2020-21), sixth (2021-22), and seventh grade (2022-23) years.

59.     Ryan excels academically in most areas, particularly in mathematics. However, he has always struggled with reading and written expression, as both are challenging for him; particularly inferencing, idioms, and prospective taking.

60.     Ryan also always struggled with transitions, including transitions within the classroom, along with anxiety and depression, which worsened in the fifth grade.

61.     The District chose to remain virtual for the start of the 2020-21 school year (Ryan's fifth grade year) due to the COVID-19 pandemic.

62.     During the start of the 2020-21 school year, Ryan received two live zoom sessions per day, with asynchronous instruction and independent work between live sessions.

63.    During his virtual instruction, Ryan received the support of a Therapeutic Support Staff ("TSS") through outside agencies not associated with the District.

64.    Ryan struggled significantly with trying to learn in a virtual environment. He began to engage in behaviors and meltdowns that the Parents had not previously observed, including head-banging, throwing chairs, putting holes in the wall, and destroying property such as breaking windows and televisions.

65.    Ryan also began engaging in suicidal ideation during his meltdowns in the virtual setting, telling his parents that he wanted to die.

66.    Ryan's parents shared their concerns about suicidal ideation with the District.

67.    At the end of October 2020, the District transitioned to a hybrid model of learning in which the students returned to in-person instruction two days per week and remained virtual three days per week (with half the students coming on Mondays and Tuesdays and half the student attending Wednesdays and Thursdays, and all students virtual on Fridays).

68.    Because Ryan was a student eligible under the IDEA, he was permitted to return in-person for four days per week; he remained virtual on Fridays.

69.    Because only half of the full student body was attending at any given time during the initial transition to hybrid, Ryan only had approximately ten students in any of his classes, which made the initial transition more manageable.

70.    While being in-person relieved some of his issues related to virtual learning, Ryan still experienced significant struggles with depression, anxiety, and peer conflicts.

71.    Shortly after his return to in-person learning, Ryan's struggles rose to the point where, on or about late October 2020, he engaged in suicidal statements.

72.    On or about November 17, 2020, Ryan again engaged in suicidal statements.

73.    In response to November 17, 2020 statements, the District's school psychologist completed the Columbia Suicide Rating Scale with Ryan, wherein he reported that he wanted to die stating "I am literal when I say I want to kill myself."

74.    He reported that he thought about killing himself every other day and that he has tried to hurt himself.

75.    Although the Parents were made aware of the statements and the incident that led to the statements, the Parents were not advised that the Columbia Suicide Rating Scale was completed or provided a copy until the due process hearing.

76.    Given Ryan's ongoing struggles in school following his return and suicidal ideation at school, the Parents reached out to the District over concerns of a possible emotional disturbance diagnosis and additional supports.

77.    The District issued a Prior Written Notice ("PWN") for a Reevaluation to which the Parents consented.

78.    Pending the completion of the Reevaluation, a revision IEP meeting was held on December 11, 2020, at which the team added weekly check-in with a prevention specialist for a six-week period in response to Ryan's suicidal ideation at school.

79.    The District did not implement the check-in with a prevention specialist; the check-ins were done by Ryan's special education teacher, Sandra Faulkner, and his guidance counselor, Ms. Merrill.

80.    The District completed a reevaluation and issued a Reevaluation Report on or about December 21, 2020 ("December 2020 RR").

81.    Updated academic testing completed as part of this reevaluation consisted of the administration of a single subtest (Reading Comprehension) from the Wechsler Individual

14

Achievement Test, Third Edition ("WIAT-III").

82.     No other academic assessments, including in written expression, were administered at this time.

83.     Updated social and emotional testing administered as part of the December 2020 RR consisted of the completion of parent and teacher rating scales on the Behavior Assessment Scale for Children, Third Edition ("BASC-3") and a self-rating scale completed by Ryan on the Children's Depression Inventory, Second Edition ("CDI-2").

84.     Parent BASC-3 rating scales revealed clinically significant or at-risk scores in all but a few areas assessed, while teacher rating scales revealed clinically significant scores in Anxiety, Depression, Internalizing Problems, Anger Control, Emotional Self-Control, and Negative Emotionality, and at-risk scores in Adaptability and Resiliency.

85.     Ryan rated himself in the Very Elevated range on all areas of the CDI-2.

86.     The District did not complete an updated Functional Behavior Assessment ("FBA") at that time.

87.     The last FBA the District completed was in September of 2016.

88.     The December 2020 RR concluded that Ryan remained eligible for services under the IDEA under the primary classification of Autism, and the secondary classifications of Emotional Disturbance and Speech or Language Impairment.

89.     An annual IEP meeting occurred on January 5, 2021, at which the District and Family reviewed the results of the December 2020 RR.

90.     The IEP team did not update Ryan's social-emotional and behavioral goals. Instead, the January 2021 IEP included the same goals with the same levels of achievement as the previous January 2020 IEP, indicating that Ryan failed to meet those goals over the course of the last IEP

year.

91.    Despite Ryan's ongoing struggles and failure to meet IEP goals, the specially designed instruction and accommodations in the IEP were also virtually identical with the exception of a notation that a crisis plan was added and that review and practice of handwriting would occur.

92.    The IEP continued Ryan's placement in an itinerant learning support environment for 96% of his day and did not increase his time in special education.

93.    Due to possible exposure to COVID-19, Ryan and his service providers were required to quarantine so the December 2020 RR did not include updated speech or occupational therapy assessment, and a new PWN for a Reevaluation was issued on January 7, 2021, to which the Parents consented.

94.    On January 25, 2021, the District and Family met for an IEP revision meeting, at which the crisis plan was modified at the Parents' request to indicate that prone and supine holds—two specific types of restraints—are not to be used with Ryan under any circumstances.

95.    On March 8, 2021, the District reissued a Reevaluation Report that included the updated speech and language and occupational therapy assessments that could not be completed in time to be included in the December 2020 RR.

96.    On March 26, 2021, the parties met again for an IEP revision meeting, at which the District concluded that Ryan required COVID Compensatory Services for a lack of progress in social skills during virtual education.

97.    On May 21, 2021, the Parents participated in a meeting to discuss Ryan's transition to the Marsh Creek Sixth Grade Center.

98.    Although notes were taken by the District during the meeting, those notes were not shared with the Family, and no other formal documentation of the meeting was ever provided to

the Family.

99.   Students from all elementary schools within the School District transition to the Marsh Creek Sixth Grade Center for 6th grade, creating a very large school environment with classes sizes of approximately 20 to 29 students.

100.   During the May 21, 2021, transition meeting, the Parents expressed their perspective on Ryan's struggles and the kinds of supports he needed.

101.   In particular, the Parents requested that the School District place Ryan in classes with a particular student to whom Ryan was very close and with other students from Springton Manor Elementary School to support Ryan's transition into the larger school environment.

102.   The Parents also asked that the School District not assign Ryan to a particular guidance counselor because, based on a previous experience with that individual, the Parents did not think it would a good match.

103.   Following the meeting Ryan's mother believed that her requests and perspectives were well received and felt better about the transition to the Sixth Grade Center.

104.   On June 20, 2021, the IEP team again revised the IEP to document parental concerns within the IEP. No other changes were made.

105.   The School District did not incorporate any of the Parents' requests.

106.   When Ryan received his class schedule for the Sixth Grade Center at the beginning of the 2021-22 school year, he had no classes with the requested student, nor any of his classmates from Springton Manor Elementary School.

107.   The District did assign him to the requested guidance counselor, and explained at the hearing that they could not accommodate both requests.

108.   However, within the first two months of the 2021-22 school year, and in response

17

to Ryan's significant social-emotional struggles at Marsh Creek, the District was in fact able to accommodate both requests, as Ryan's schedule was changed so that he could have classes with the specific student the Parents had requested as part of the transition meeting.

109.    Ryan quickly began to deteriorate at Marsh Creek. Within the first month of school, he expressed to his Parents that he did not want to go to school at Marsh Creek.

110.    He began wetting the bed three to four times a week.

111.    Ryan experienced panic attacks during which he would hyperventilate, shake, and cry.

112.    Most nights at bedtime he would cry and say that he did not want to go to school.

113.    On at least one occasion, his Parents had to take him to the emergency room because of complaints of chest pains.

114.    After numerous tests, the doctors concluded that Ryan was having severe stress and anxiety related to school.

115.    Ryan also began engaging in suicidal ideation and making suicidal statements again both at school and at home.

116.    As the year progressed, Ryan's social-emotional and behavioral struggles got progressively worse.

117.    On October 12, 2021, Ryan's parents participated in an IEP meeting. At the time of this IEP meeting, his parents reported that Ryan was feeling unsafe at school, and that the school was too big for him and that he was overwhelmed. The Parents also reported Ryan was having difficulty making friends at Marsh Creek. The Parents also expressed concern that the Marsh Creek Center may not be the right placement for Ryan.

118.    The District proposed a few additions to Ryan's IEP, including weekly meetings

18

with the counselor or prevention specialist, morning check-ins, and a pass to go to the counselor when needed.

119.    No other changes were made to his IEP at this time, including no changes to the goals, behavior plan, or his placement in an itinerant learning support setting.

120.    No positive response or improvement was observed in Ryan following the implementation of these revisions to the IEP.

121.    On November 10, 2021, the parties met for another IEP meeting in response to the Parents' request that Ryan attend the Downingtown Cyber Academy ("DCA") as Ryan could not continue at Marsh Creek due to his ongoing deteriorating social-emotional and behavioral issues.

122.    The District denied the Parents' request for full time enrollment in DCA and would only agree to part-time attendance.

123.    Several additional accommodations were added to the IEP as well as a proposed psychiatric evaluation.

124.    The IEP also included some additional time in a Functional Strategies class, which decreased Ryan's time in the regular education environment by a total of 13%, from 96% to 83%.

125.    Ryan remained in an itinerant level of learning support. No other changes were made to the IEP.

126.    The Parents also requested consideration of other programs operated by the Chester County Intermediate Unit ("CCIU"), including the Gateway Program and TEACH.

127.    The District rejected those options out of hand.

128.    The Parents ultimately decided that the IEP offered by the School District did not meet Ryan's needs, and notified the District on November 14, 2021, that Ryan had been accepted into private school, and that they were withdrawing him from the District.

129.    In response to Ryan's withdrawal, Sallie Seidel, Supervisor for Special Education for the District, sent the Parents a letter on November 15, 2021, indicating that the District believes it has provided Ryan a FAPE and would not fund a private school placement.

130.    The letter also indicated that the Parents have a right to request a multidisciplinary reevaluation and/or an IEP meeting.

131.    The Parent reached out to Ms. Seidel after receiving the letter and expressed concern over how a reevaluation or IEP would be helpful to Ryan at this point, given the District's inability to meet his social-emotional needs, and asked if the District could further explain.

132.    Ms. Seidel responded by stating that the District sends that letter out to all parents of students with disabilities when they disenroll from the District to attend private school.

133.    The Parents reached out again to Ms. Seidel on February 15, 2022, asking about the earlier psychiatric evaluation and whether the District could still complete that assessment even though Ryan was no longer attending school in the District.

134.    Ms. Seidel indicated that he could be evaluated and that she asked that he be placed on the waiting list for the evaluation.

135.    The Parents responded and asked to be informed when the evaluation would be possible.

136.    As of the last date of hearing, over a year later, no evaluation had been scheduled, and no alternative evaluator had been identified by the District.

137.    On November 15, 2021, Ryan began attending The Concept School ("TCS").

138.    TCS is a small school with a total of thirty-six students, with ten fulltime teachers, all of whom are certified by the state in the subject matter they teach, a fulltime counselor who is a Board Certified Behavior Analyst ("BCBA") and Licensed Professional Counselor ("LPC"), and

the Head of School.

139.    Class sizes are small, typically ranging from as few students as two to as many as seven, and allow for individualized instruction and assessment.

140.    Students at TCS may have learning disabilities, ADHD, executive functioning deficits, anxiety, depression, and/or autism.

141.    Ryan participated in the TCS admission process which includes a review of the student's IEPs, evaluations, and report cards, a school tour, and a two-day visit.

142.    The admissions process can be completed within one week's time.

143.    Ryan typically arrives at TCS at 8:30 a.m. to 8:45 a.m. and goes to his first period class that also serves at homeroom. TCS runs on an eight-period day, with six of the periods lasting fifty minutes, and two lunch periods lasting forty minutes each (with Ryan only attending one lunch).

144.    Teachers also build in a five-minute break at the end of each class so that the students can go outside and reset for the next class.

145.    Ryan also receives support and instruction throughout his day in executive functioning skills and social-emotional skills and meets with the counselor.

146.    Ryan also receives assistive technology as part of his program.

147.    Although TCS does not use any one program or curriculum for all of its students, teachers have access to multiple research-based strategies and curricula that they can pull from based on individual student needs.

148.    Ryan has made tremendous progress since attending TCS.

149.    Ryan's confidence level and his ability to accept challenges outside of his comfort zone have grown greatly and he has developed friendships at the school.

150.    He has also developed his ability to take others' perspectives.

151.    His teachers love working with him.

152.    In the areas of math, Ryan has made so much progress that he is now learning at an advanced or accelerated pace.

153.    The Parents also saw tremendous social, emotional, and academic progress in Ryan since attending TCS.

154.    He has made wonderful friends with students and developed great relationships with his teachers and counselor with whom he meets regularly.

155.    Ryan no longer requires a behavior plan or the support of a TSS or Wrap Around Services given his progress.

156.    He stopped wetting the bed almost immediately after attending TCS.

157.    Home life is no longer stressful for Ryan and his family.

158.    Academically, TCS meets Ryan where he is, so if he needs to be accelerated in certain areas like math, TCS can accommodate that.

159.    For areas that have historically been more challenging for him like written expression and higher-level comprehension skills, TCS breaks things down and groups things for him at his level.

160.    He is in small classrooms where he is able to receive differentiated instruction the entire day.

161.    The Parents obtained a Neuropsychological Evaluation by Drs. Mary Lazar and Meghan DeVries at Developmental Neuropsychology Associates in March of 2022.

162.    A final report was provided to the Family on June 30, 2022.

163.    The Family provided the report to the District on July 14, 2022.

22

164.    Dr. Lazar and Dr. DeVries' evaluation was thorough and comprehensive, and included a review of records from Ryan's time in the School District; a review of records from TCS, a parent interview and developmental questionnaire, an observation at TCS, the completion of parent and teacher rating scales, and the administration of a variety of assessment tools.

165.    Assessments administered by Dr. Lazar and Dr. DeVries included the Wechsler Intelligence Scale for Children, Fifth Edition ("WISC-V"), Wide Range Assessment of Memory and Learning, Third Edition ("WRAML-3"), the California Verbal Learning Test ("CVLT-C"); the Rey Complex Figure Test; the Conners Continuous Performance Test; the Delis-Kaplan Executive Functioning System ("D-KEFS"), The Kaufman Test of Educational Achievement, Third Edition ("KTEA-3"), the CDI-2, the Multidimensional Anxiety Scale for Children, Second Edition ("MASC-2"); the BASC-3, the Behavior Rating Inventory of Executive Functioning, Second Edition (BRIEF-2"), and the Autism Spectrum Rating Scales ("ASRS").

166.    All the assessments were administered under normal circumstances and without modifications, except to the extent Dr. Lazar offered to scribe for Ryan when he was asked to write something and refused.

167.    The evaluators established a good rapport with Ryan during testing, and the results of the assessment were deemed accurate.

168.    Ryan continued to show overall average cognitive functioning.

169.    Consistent with previous testing and observation by District teachers, Ryan showed difficulties in the areas of higher-level reading comprehension and written expression.

170.    Testing also revealed ongoing social-emotional and behavioral concerns, as well as executive function issues. However, a comparison of the BASC-3 rating scales completed by Ryan's mother and teachers as part of Dr. Lazar and Dr. DeVries' evaluation with the Parent and

teacher rating scales completed when Ryan was in the District shows a marked decrease in overall social-emotional and behavioral concerns.

171.    Dr. Lazar and Dr. DeVries provided the following diagnoses: Autism Spectrum Disorder, Generalized Anxiety Disorder, Unspecified Depressive Disorder, and ADHD.

172.    The report includes a variety of academic, social-emotional, and behavioral recommendations and educational needs for Ryan.

173.    Dr. Lazar and Dr. DeVries also concluded that the results of their evaluation support Ryan's continued placement at TCS, and that in the smaller environment of TCS, which is critical to be able to address Ryan's autism-related needs, Ryan's academic and social-emotional needs are being met.

174.    Nothing about the results of the evaluation caused any concern or pause for the appropriateness of TCS for Ryan for Dr. Lazar or Dr. DeVries.

175.    TCS was provided with a copy of the Neuropsychological Evaluation by Dr. Mary Lazar and Meghan DeVries over the summer of 2022.

176.    TCS reviewed that evaluation and had no concerns over TCS' ability to meet Ryan's needs as indicated in the report.

177.    In response to receiving a copy of the report by Dr. Lazar and Dr. DeVries, the District informed the Parents on July 18, 2022, that it would be in touch about setting up a meeting.

178.    As the Parents heard nothing from the District close to a month later, the Parents' provided notice to the District of their intent to maintain Ryan's placement at TCS for seventh grade, and requested the School District fund that placement.

179.    In response to this notice, the District scheduled an IEP meeting for August 22, 2022, and the Parents also made Ryan available for baseline testing by the District.

180.   The resulting August 22, 2022, IEP continued to offer the same social-emotional and behavioral goals from the District's previous IEPs that were in place in the middle of fourth grade and relied on the old baseline data, as well as the same behavior plan.

181.   Similarly, much of the specially designed instruction and accommodations are the same from previous IEPs.

182.   The IEP does include some new goals and increases the amount of support periods/classes Ryan would receive.

183.   However, the baseline data is based on assessments completed by Sallie Seidel shortly before the August 22, 2022, IEP, who never previously worked with or assessed Ryan, and Ryan often refused to comply with the task during baseline testing with Ms. Seidel.

184.   Given that Ms. Seidel had never previously worked with Ryan or assessed him, and given his anxiety and his lack of cooperation, the data is more of a measure of his working with Ms. Seidel than of any actual academic or social-emotional functioning.

185.   Overall, the District proposed a supplemental level of support at Downingtown Middle School, where Ryan would be placed in the regular education environment for 75% of his day.

186.   Downingtown Area Middle School has approximately 1100 students with a class size of approximately twenty-five students.

187.   Some of the Parents' concerns over the August 2022 IEP included the overall size of the school and the size of his classes given Ryan's demonstrated need for a smaller class size and smaller school environment.

188.   The Parents were also concerned that Ryan's instruction in social-emotional and executive functioning was occurring in separate functional classes, where at TCS he receives that

instruction in the moment in all of his classes, which is possible due to the small size at TCS.

189.    Having the ability to receive instruction in the moment is critical for Ryan to generalize skills and be successful.

190.    Ryan has a history of difficulty with generalizing skills learned in separate functional skills classes to other settings.

191.    Having instruction in the moment assists Ryan with the generalization of skills.

192.    The Parents ultimately rejected the August 22, 2022, IEP as inappropriate, and continued Ryan's placement at TCS for the 2022-23 school year.

193.    Although the Parents signed the TCS contract for the 2022-23 school year on April 20, 2022, they were able to cancel the contract at any time prior to the start of the 2022-23 school year, with their financial liability being limited to the loss of a $350.00 deposit.

**VIII.   The Hearing Officer's Errors**

194. The Hearing Officer's conclusion that the Family is not entitled to any relief is based on evidence that was significantly contradicted in the record and is based on errors of law relating to the standard of a Free Appropriate Public Education.

195.    The Hearing Officer repeatedly mischaracterized or ignored undisputed facts in the record, for example, by referring to Ryan's suicidal ideation as "negative self-talk" when the documentary evidence showed that he was engaging in suicidal ideation and suicidal statements. Accordingly, the findings of fact are contradicted by non-testimonial evidence.

196.    The Hearing Officer placed an undue and unwarranted burden on the Family's expert when he criticized Dr. Lazar for not observing Ryan at the District's schools or talking with District witnesses; Ryan was no longer attending school in the District at the time of the evaluation and Dr. Lazar observed and spoke with teachers at the private school and reviewed District records.

Incredibly, The Hearing Officer did not similarly discredit the District's witnesses for their lack of observation at or discussions with the private school.

197.    The Hearing Officer incorrectly stated that Ryan's emotional issues were related to issues in the home, which is contradicted by the District's own records which noted that Ryan expressed his anxiety was related to school.

198.    The Hearing Officer incorrectly concluded that the Parents refused an evaluation. The Parents responded to the District asking why the District thought such as evaluation was necessary. The District then never responded to the Parents. After about a month, the Parents asked for the evaluation to go forward. The Hearing Officer erred to find against the Family based on a lack of consent.

199.    The Hearing Officer correctly determined that Ryan's placement at the private school was appropriate and that he made progress at TCS.

200.    The Hearing Officer incorrectly found that the Parents did not provide ten business days of notice that they were removing Ryan from the District. In doing so, he ignored clear and uncontradicted documentary evidence to the contrary (relating to the 2022-23 school year) and ignored that the District was indisputably aware of Parents' concerns and the District sent a letter denying the tuition, admitting that it is a standard letter and the IEP meeting referenced in it is offered to everyone (relating to the 2021-22 school year). Rather than review the evidence and weigh whether any basis existed to deny or reduce tuition, the Hearing Officer incorrectly determined, wholesale, that the Parents did not meet this procedural prong at all.

201.    The Hearing Officer erroneously determined that the Family waived issues that were raised in the Family's Due Process Complaint and closing argument including the District's failure to meet Ryan's academic needs and to provide Ryan with an appropriate IEP including

appropriate present levels of education.

202.    The Hearing Officer displayed a disturbing bias in favor of the District and failed to conduct an appropriate due process hearing when he limited the Family to ten minutes of direct examination for the Family's expert witness and gave the District one hour of cross examination of the witness; this bias in favor of Districts is an unfortunate and unique pattern as reflected in the procedures and historical decisions of Hearing Officer Gerl.

203.    The unequal treatment of the parties in favor of school districts is emblematic of Hearing Officer Gerl's troubling record as a Hearing Officer. A review of Hearing Officer Gerl's 53 published decisions as of the date of this filing reveals that he has found fully or partially for the school district in 47 cases (with much of the "partial" relief awarded to the families being either *de minimis* or essentially of little utility to the child), and with only six findings for families. He has not granted complete tuition reimbursement to any family, and has denied tuition in all but one case, in which he awarded only 50% tuition.

204.    Throughout many of his cases, unequal treatment of various types is evidenced in a manner that reflects the lack of impartiality required by IDEA.

205.    Pennsylvania's Office of Dispute Resolution maintains a Stakeholders Council with representatives from school districts, private counsel, parents, and others which interviews and recommends appointments of all hearing officers when openings exist. Prior to the appointment of Hearing Officer Gerl, these recommendations were universally accepted, but Hearing Officer Gerl was appointed as a hearing officer despite not having been recommended by the Stakeholders Counsel, the first time such a recommendation was overruled.

206.    The Hearing Officer erred as a matter of law when he concluded—in bizarre fashion and contrary to established law—that whether a student makes progress in his program is not

28

relevant to whether a District offered a FAPE.

207.    The Hearing Officer erroneously—and astonishingly—concluded that issues relating to whether a student is receiving an appropriate level of services are not FAPE issues.

## IX.    Conclusion

WHEREFORE, the Plaintiffs respectfully request that this Court:

1.    Assume jurisdiction over this action;

2.    Reverse the decision of the Hearing Officer's decision and award (a) compensatory education from October 24, 2020 to November 15, 2021, (b) reimbursement for tuition, costs, and transportation for the 2021-22 school year (starting on November 15, 2021) and the 2022-23 school year, and (c) reimbursement of the Family's independent educational evaluation;

3.    Declare the Defendant's actions and omissions to be violative of IDEA, Section 504, the ADA and Pennsylvania law;

4.    Order the Defendant to pay Plaintiffs their reasonable attorneys' fees and related costs; and

5.    Grant such other relief as this Court deems proper.

Respectfully submitted,

Dennis C. McAndrews, Esquire
PA ID No. 28012

Michael J. Connolly, Esquire
PA ID No. 82065

Jacqueline C. Lembeck, Esquire
PA ID No. 314535

McANDREWS, MEHALICK, CONNOLLY,
HULSE and RYAN, P.C.
30 Cassatt Avenue
Berwyn, Pennsylvania 19312
Tele: 610-648-9300
Attorneys for Plaintiffs

30