**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RYAN S., by and through his parents, | : | Civil Action |
| George S. and Christine S., and | : | |
| GEORGE S. and CHRISTINE S., | : | No. 2:23-03270-JMY |
| individually, | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| DOWNINGTOWN AREA | : | |
| SCHOOL DISTRICT | : | |
| Defendant. | : | Hon. John M. Younge |

**PLAINTIFFS' BRIEF IN SUPPORT OF**
**MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Respectfully submitted,

/s/ *D. Daniel Woody*
D. Daniel Woody, Esquire
ID No. 309121

/s/ *Michael J. Connolly*
Michael J. Connolly, Esquire
ID No. 82065

/s/ *Dennis C. McAndrews*
Dennis C. McAndrews, Esquire
ID No. 28012

McANDREWS, MEHALICK, CONNOLLY,
HULSE & RYAN, P.C.
30 Cassatt Avenue
Berwyn, PA 19312
(610) 648-9300 (phone)
(610) 648-0433 (fax)
Attorneys for Plaintiffs

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF THE QUESTIONS PRESENTED ....................................... 2

III.   STATEMENT OF THE FACTS ........................................................................ 3

      A.     Procedural History ................................................................................. 3

      B.     Conduct of the Hearing ......................................................................... 3

      C.     Factual History ...................................................................................... 6

           1.     Ryan's Background ................................................................... 6

           2.     Ryan struggled with virtual instruction during his fifth grade year, resulting in academic regression and emotional setbacks, including self-injurious behaviors and a desire to commit suicide ................................................... 6

           3.     The December 2020 Reevaluation Report (from fifth grade) revealed that Ryan was demonstrating Clinically Significant needs in many social and emotional domains ................................................................. 8

           4.     Ryan quickly deteriorated emotionally in sixth grade .............................. 11

           5.     At an October 12, 2021 IEP meeting (in sixth grade) following new suicidal ideations, the School District proposed only nominal changes to his IEP ..12

           6.     The Family obtained a comprehensive Neuropsychological Evaluation by Drs. Mary Lazar and Meghan DeVries, who recommended a continued placement at the Concept School ............................................................. 14

IV.   STANDARD OF REVIEW ............................................................................... 17

V.    SUMMARY OF THE ARGUMENT ................................................................ 19

VI.   ARGUMENT ..................................................................................................... 20

      A.     The Family was not afforded a fair and impartial due process hearing by the Hearing Officer ............................................................................................... 20

      B.     Ryan is entitled to full days of compensatory education from October 24, 2020, through November 15, 2021, because the School District failed to provide appropriate supports and services to meet his social and emotional needs .......... 26

C.    The Family is entitled to tuition reimbursement at the Concept School ............... 35

1.    The School District failed to offer Ryan a FAPE through its November 2021 and August 2022 IEPs ................................................................................ 37

2.    The equities favor a tuition award, as the Family fully cooperated in the IEP process and only rejected the IEPs because Ryan was exhibiting serious emotional needs and the School District was repeating its ineffective supports and services from year to year .................................................... 37

VII.    CONCLUSION ........................................................................................................... 42

## I.    INTRODUCTION

Plaintiff Ryan S. is a thirteen-year-old child with disabilities including Autism, Generalized Anxiety Disorder, Unspecified Depressive Disorder, and Attention Deficit Hyperactivity Disorder. During fifth grade at the Defendant Downingtown Area School District, Ryan deteriorated emotionally in the large school environment and general education classroom with minimal special education support to the point of engaging in suicidal ideation and making suicidal statements. The District offered minimal, ineffective supports which failed to address Ryan's rapidly worsening social and emotional functioning. Consequently, Ryan's family was forced to unilaterally place him in a private school, The Concept School, that met his needs.

Ryan, along with his parents, Plaintiffs George S. and Christine S. (collectively with Ryan "the Family"), filed a special education administrative Due Process Complaint requesting compensatory education from October 24, 2020 to November 15, 2021, and reimbursement for tuition, costs, and transportation for the 2021-22 school year (starting on November 15, 2021) and the 2022-23 school year pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, et seq.; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, et seq. The Special Education Hearing Officer denied their requests. The Family now appeals to this Court and moves for judgment on the administrative record to reverse the Hearing Officer's Decision.

In addition, the Family submits that it was denied a fair and impartial due process hearing. Although the Family had the burden of proof in this matter, Hearing Officer James Gerl ("Hearing Officer" or "Mr. Gerl") unfairly limited the Family's direct examination of its only expert witness, limiting direct examination to a paltry 10 minutes. Meanwhile, Mr. Gerl permitted the School District to have one hour of direct examination for each of its witnesses. Furthermore, Mr. Gerl

1

criticized the Family's expert for not observing Ryan in the School District's schools even though Ryan was no longer attending school in the District; repeatedly downplayed Ryan's suicidal plan as "negative self-talk;" and failed to provide meaningful citations to the record to support his findings. Indeed, in some instances, he cites collectively to over 100 pages of exhibits to support a specific factual finding.

As a result, the Family respectfully requests that this Court give no deference to the Hearing Officer's unreliable factual findings, credibility determinations, and legal conclusions.

## II.    STATEMENT OF THE QUESTIONS PRESENTED

A.    Did the Hearing Officer deny the Family their right to a fair and impartial hearing and decision when he unfairly limited the Family's examination of an expert witness to 10 minutes, limited all other witnesses to one hour, and failed to provide meaningful citations to the record to support his findings?

(Suggested Answer: Yes.)

B.    From October 24, 2020, through November 15, 2021, the School District repeated Ryan's ineffective specially designed instruction, related services and IEP goals, and he therefore did not make meaningful educational progress with respect to his emotional needs. Is Ryan entitled to full days of compensatory education for this period?

(Suggested Answer: Yes.)

C.    Despite Ryan's worsening emotional needs, in November of 2021, the School District repeated the goals, behavior plan, and placement contained in previous ineffective and inappropriate IEPs. Thereafter, the District failed to meaningfully change Ryan's August 2022 IEP beyond the District's November 2021 IEP. The Family repeatedly voiced their concerns, fully

2

participated in the IEP process, and gave the School District ample opportunity to amend Ryan's IEP. Did the School District fail to offer Ryan a FAPE through its November 2021 and August 2022 IEPs, and do equitable considerations support tuition reimbursement at the Concept School from November 2021 through the 2022-2023 school year?

(Suggested Answer: Yes.)

### III.    STATEMENT OF THE FACTS

#### A.    Procedural History

On October 24, 2022, the Family, through counsel, sent a letter to the School District requesting a special education due process hearing. AR Doc. 4-9 (Due Process Complaint). [1] The Pennsylvania Department of Education assigned Mr. Gerl as a Hearing Officer and two hearing sessions were held on February 17, 2023, and April 4, 2023. AR Doc. 4-7 (N.T. 2/17/23); AR Doc. 4-6 (N.T. 4/4/23). The parties submitted written closing arguments on April 28, 2023, and on May 25, 2023, the Hearing Officer issued his Final Decision and Order (Decision). AR Doc. 4-3 (Decision). The Family then timely appealed the Decision to this Court. The parties have determined that no further discovery is necessary and that this Court can decide this matter based on the administrative record.

#### B.    Conduct of the Hearing

The Family called five witnesses in its case-in-chief: Ryan's mother (Plaintiff Christine S.), an expert witness (Mary Lazar), the Head of School of The Concept School (William Bennett), and two School District employees. While the Family called the School District employees in their case-in-chief, these were the equivalent of hostile witnesses.

---

[1] Documents in the Administrative Record ("AR") are cited as "AR Doc __-__", with a parenthetical describing the document where necessary to provide context to the AR cite.

Mr. Gerl limited the testimony of all witnesses (other than the Family's expert) to only 60 minutes per witness. Although the Family was essentially calling only three witnesses to support its cases, Mr. Gerl inexplicitly limited the Family's direct examination of the Family's expert witness to 10 minutes. AR Doc. 4-6 at 4 (N.T. 4/3/23, 384). Initially, he was not going to permit the Family any redirect examination, but relented and permitted a brief redirect AR Doc. 4-6 at 13 (N.T. 4/3/23, 419) (limiting redirect). In contrast, he permitted all School District employees to have one hour of direct examination. *See* AR Doc. 4-7 at 46 (N.T. 2/17/23, 177) (warning Family's counsel that the emotional support teacher, Sally Falkner, who the Family called on direct, had 25 minutes left to testify); AR Doc. 4-7 at 53 (N.T. 2/17/23, 205) (warning counsel for the District that she had 25 minutes left to cross examine Ms. Falkner); AR Doc. 4-7 at 67, 72 (N.T. 2/17/23, 259-60, 279) (advising Family's counsel that he used 47 minutes of his allotted 60 minutes to examine Allison Hill, an emotional support teacher); AR Doc. 4-6 at 15-16 (N.T. 4/3/23, 433-34) (reminding School District counsel that she had 30 minutes remaining to examine the District's school counselor).

He limited and strictly enforced Ryan's mother's testimony to 60 minutes, repeatedly warning counsel for the Family how many minutes the mother had left to make her case. AR Doc. 4-7 at 20, 23, 26 (N.T. 2/17/23, 71, 85, 95 (giving warning that she had 35, 17, and 5 minutes left, respectively)). Because the mother testified for 60 minutes on direct examination, when it came time for redirect Mr. Gerl told the Family's counsel: "unfortunately, [you are] . . . out of time." *Id*. at 36 (N.T. 10/4/23, 137). But the Hearing Officer reluctantly permitted a three-minute redirect. *Id*. Thus, while the Family was essentially only calling three witnesses, Mr. Gerl allowed the Family two hours and 10 minutes to put on its case.

He also limited opening statements for both parties to five minutes, which he later

4

expanded to 10 minutes. AR Doc. 4-7 at 9, 13 (N.T. 2/7/23, 30, 46).

In his Decision, the Hearing Officer made factual findings and legal conclusions without specific citations to the record. For example, the Hearing Officer concluded that Ryan "made significant progress with the student's ability [sic] to self-regulate and demonstrate appropriate social skills." AR Doc. 4-3 at 8 (*citing generally* "J-14 and J-15"). Exhibit J-14 is the January 13, 2020 IEP and is 61 pages in length. Exhibit J-15 is the 2020 RR, which is 30 pages in length. The Hearing Officer failed to provide any pinpoint citation to these 91 pages of exhibits to support his crucial factual and legal conclusion that Ryan "made significant progress."

The Hearing Officer again concluded that Ryan "made significant progress" without providing a meaningful citation to the record: "The student subsequently made significant progress with the student's ability to self-regulate and demonstrate appropriate social skills." *Id*. (*citing generally* J-14, J-15). Again, Joint Exhibits 14 and 15 consist of 91 single-spaced pages.

The Hearing Officer concluded that Ryan "made progress" towards his IEP goals in the first semester of the 2021-22 school year; but the Hearing Officer did not provide a specific citation to the record to support that claim:

> During the first semester of the 2021 – 2022 school year, the student made progress on the student's IEP goals. The student received grades of A and B in all of the student's academic classes.

AR Doc. 4-3 at 15 (*citing* J-31, J-39, J-41, J-45). Joint exhibit 31 is a 66-page IEP; exhibit 39 is a 17-page Communications Chart; exhibit 41 is an 11-page Progress Report; and exhibit 45 is a 59-page IEP. Mr. Gerl did not provide a specific citation to the record within these 167 pages of exhibits to support his conclusion that Ryan "made progress on [his] IEP goals."

C.    **Factual History**

1.    **Ryan's Background**

Ryan is a student with Autism, Generalized Anxiety Disorder, Unspecified Depressive Disorder, and ADHD. AR Doc. 4-3 at 4 (Decision). Ryan excels academically in most areas, particularly in mathematics. AR Doc. 4-7 at 15 (N.T. 2/17/23, 54). However, he has always struggled with reading and written expression. *Id.* As a student on the Autism Spectrum, he has great difficulty drawing inferences, understanding idioms, and recognizing others' perspective. AR Doc. 4-8 at 134 (1/13/20 IEP). Ryan also has always struggled with transitions, including those within the classroom, and with anxiety and depression. AR Doc. 4-7 at 16 (N.T. 2/17/23, 55); AR Doc. 4-6 at 36 (N.T. 4/3/23, 510-512).

2.    **Ryan struggled with virtual instruction during his fifth grade year, resulting in academic regression and emotional setbacks, including self-injurious behaviors and a desire to commit suicide.**

The District chose to provide virtual instruction for the start of the 2020-21 school year (Ryan's fifth grade year) due to the COVID-19 pandemic. AR Doc. 4-7 at 16 (N.T. 2/17/23, 56-57). Ryan struggled significantly with learning in a virtual environment. *Id.* He began to engage in behaviors that the Parents had not previously observed, including head-banging, throwing chairs, punching holes in walls, and destroying property such as breaking windows and televisions. AR Doc. 4-3 at 7 (Decision, 6). He also began engaging in suicidal ideation during his meltdowns in the virtual setting, telling his parents that he wanted to die. *Id.* at 8.

At the end of October 2020, the District transitioned to a hybrid learning model in which the students returned to in-person instruction two days per week and remained virtual three days per week. *Id.* at 7. Because Ryan was a student eligible under the IDEA, he was permitted to return in person for four days per week; he remained virtual on Fridays. *Id.* Because only half of the

6

student body was attending at any given time during the initial transition to hybrid, Ryan had approximately ten students in his classes, which made the initial transition more manageable. AR Doc. 4-7 at 17 (N.T. 2/17/23, 59-60).

While in-person instruction relieved some of his issues related to virtual learning, Ryan still experienced significant struggles with depression, anxiety, and peer conflicts. AR Doc. 4-8 at 227-28, 230-31) (10/2020 Emails between District and Family). Shortly after his return to in-person learning, Ryan's struggles rose until, on or about late October 2020 and early November 2020, he engaged in suicidal statements. AR Doc. 4-8 at 234 (Email from Family to District). Ryan's parents shared their concerns about suicidal ideation with the District and on November 2, 2020, and requested an immediate crisis assessment. AR Doc. 4-3 at 8 (Decision).

On or about November 17, 2020, Ryan again engaged in suicidal statements. AR Doc. 4-7 at 18 (N.T. 2/17/23, 63-65). The District's school psychologist completed the Columbia – Suicide Severity Rating Scale ("CSSRS") with Ryan on November 18, 2020, wherein he reported that he wanted to die stating "I am literal when I say I want to kill myself." AR Doc. 4-8 at 326 (CSSRS). He reported that he thought about killing himself every other day and that he has tried to hurt himself. *Id*. In response to the District's November 18, 2020 administration of the CSSRS, Ryan stated that he "wants to kill himself" and "that the [his] parents are murderers and are mean and that kids at school are murderers and that the [his] father slaps [him]." AR Doc. 4-3 at 8 (Decision); AR Doc. 4-8 at 325-30 (CSSRS). Although the Parents were made aware of the statements and the incident that led to the statements, they were not advised that the CSSRS was completed or provided a copy until the due process hearing. AR Doc. 4-7 at 18 (N.T. 2/17/23, 63-65).

Given Ryan's ongoing struggles in school following his return and suicidal ideation at school, the Parents reached out to the District over concerns of a possible identification of

7

emotional disturbance and the need for additional emotional supports. AR Doc. 4-7 at 19 (N.T. 2/17/23, 69-70). The District issued a Prior Written Notice ("PWN") for a Reevaluation to which the Parents consented. *Id*.

Pending the completion of the Reevaluation, a revision IEP meeting was held on December 11, 2020, at which the team added weekly check-in with a prevention specialist for a six-week period in response to Ryan's two instances of suicidal ideations in school. AR Doc. 4-8 at 344 (12/11/20 IEP). However, the District did not implement the check-in with a prevention specialist; the check-ins were done by Ryan's special education teacher, Sandra Faulkner, and his guidance counselor, Ms. Merrill. AR Doc. 4-7 at 19 (N.T. 2/17/23, 70-71).

> **3. The December 2020 Reevaluation Report (from fifth grade) revealed that Ryan was demonstrating Clinically Significant needs in many social and emotional domains.**

The District completed a reevaluation and issued a Reevaluation Report on or about December 21, 2020 ("December 2020 RR"). AR Doc. 4-8 at 391 (December 2020 RR). Updated academic testing completed as part of this reevaluation consisted of the administration of only a single subtest (Reading Comprehension) from the Wechsler Individual Achievement Test, Third Edition ("WIAT-III"), which if fully administered includes 16 academic subsets. *Id*. at 404. No other academic assessments were administered at this time. *Id*.

Updated social and emotional testing administered as part of the December 2020 RR consisted of the completion of parent and teacher rating scales on the Behavior Assessment Scale for Children, Third Edition ("BASC-3") and a self-rating scale completed by Ryan on the Children's Depression Inventory, Second Edition ("CDI-2"). *Id*. at 405-06. Parent BASC-3 rating scales revealed clinically significant or at-risk scores in all but a few areas assessed, while teacher rating scales revealed clinically significant scores in Anxiety, Depression, Internalizing Problems, Anger

Control, Emotional Self-Control, and Negative Emotionality, and at-risk scores in Adaptability and Resiliency. *Id*. at 405-07. Ryan rated himself in the Very Elevated range on all areas of the CDI-2. *Id*. at 408. The Hearing Officer did not reference any of these Clinically Significant findings in his Decision.

The District did not complete an updated Functional Behavior Assessment ("FBA") at that time. The last FBA the District completed was in September of 2016. The Hearing Officer did not reference the lack of an FBA in his Decision.

The December 2020 RR concluded that Ryan remained eligible for services under the IDEA under the primary classification of Autism, and the secondary classifications of Emotional Disturbance and Speech or Language Impairment.

An annual IEP meeting occurred on January 5, 2021, at which the District and Family reviewed the results of the December 2020 RR. *Id*. at 410-11. The IEP team did not update Ryan's social-emotional and behavioral goals; rather, the resulting IEP included the same goals with the same levels of achievement as the previous January 2020 IEP, even though Ryan failed to meet those goals over the course of the last IEP year. *Compare* AR Doc. 4-8 at 135-36, 138 (1/2020 IEP) *with* AR Doc. 4-8 at 453-55 (1/2021 IEP). The Hearing Officer's Decision did not discuss the fact that Ryan's fourth grade IEP goals were repeated in fifth grade; however, the Hearing Officer nonetheless concluded that Ryan "made progress on [his] . . . IEP goals during the fifth grade." AR Doc. 4-3 at 10 (Decision, 9). Despite Ryan's ongoing struggles and failure to meet IEP goals, the specially designed instruction and accommodations in his subsequent IEP were also virtually identical with the exception of a notation that a crisis plan was added and that review and practice of handwriting would occur. The January 2021 IEP continued Ryan's placement in an itinerant learning support environment and did not increase his time in special education. AR Doc. 4-8 at

9

467 (1/2021 IEP).

Due to possible exposure to COVID-19, Ryan and his service providers were required to quarantine in the fall of 2020 and therefore the December 2020 RR did not include an updated speech or occupational therapy assessment, and a new request for a Reevaluation was issued on January 7, 2021, to which the Parents consented. AR Doc. 4-3 at 9 (Decision, 8).

On January 25, 2021, the District and Family met for an IEP revision meeting, at which the crisis plan was modified at the Parents' request to indicate that prone and supine holds—two specific types of restraints—were not to be used with Ryan under any circumstances. *See* AR Doc. 4-3 at 9 (Decision, 8).

On March 8, 2021, the District reissued a Reevaluation Report that included the updated speech and language and occupational therapy assessments that could not be completed for the December 2020 RR. AR Doc. 4-3 at 9 (Decision, 8). On March 26, 2021, the parties met again for an IEP revision meeting, at which the District concluded that Ryan required COVID Compensatory Services for a lack of progress in social skills during virtual education. *Id*. at 9-10.

On May 21, 2021, the Parents participated in a meeting to discuss Ryan's transition to the Marsh Creek Sixth Grade Center.[2] *Id*. at 10. During the meeting, the Parents expressed their perspective on Ryan's struggles and the kinds of supports he needed. In particular, the Parents requested that the School District place Ryan in classes with a particular student to whom Ryan was very close and with other students from Springton Manor Elementary School to support Ryan's transition into the larger school environment. AR Doc. 4-3 at 10-11 (Decision, 9-10). The Parents also asked that the School District not assign Ryan to a particular guidance counselor because,

---

[2] Students from all elementary schools within the School District transition to the Marsh Creek Sixth Grade Center for sixth grade, creating a very large school environment with classes sizes of approximately 20 to 29 students. AR Doc. 4-7 (N.T. 2/17/23, 230).

based on a previous experience with that individual, the Parents did not think it would a good match. *Id*.

### 4.    Ryan quickly deteriorated emotionally in sixth grade.

When Ryan received his class schedule for the Sixth Grade Center at the beginning of the 2021-22 school year, he had no classes with the requested student, or with any of his classmates from Springton Manor Elementary School. AR Doc. 4-3 at 11 (Decision, 10). While the District did assign him to the requested guidance counselor, the District explained at the hearing that it could not accommodate both requests. *Id*.

However, within the first two months of the 2021-22 school year, and in response to Ryan's significant social-emotional struggles at Marsh Creek, the District accommodated both requests, as Ryan's schedule was changed so that he could have classes with the specific student the Parents had requested as part of the May 20, 2021, transition meeting.

Ryan quickly deteriorated at Marsh Creek. AR Doc. 4-7 at 23-24 (N.T. 2/17/23, 86-87). Within the first month of school, he told his Parents that he did not want to go to school at Marsh Creek. *Id*. He began wetting the bed three to four times a week. *Id*. He experienced panic attacks during which he would hyperventilate, shake, and cry. *Id*. Most nights at bedtime he would cry and say that he did not want to go to school. *Id*. On at least one occasion, his Parents had to take him to the emergency room because of complaints of chest pains. *Id*. After numerous tests, the doctors concluded that Ryan was having severe stress and anxiety related to school. *Id*.

Ryan also began engaging in suicidal ideation and making suicidal statements both at school and at home. *Id*. (N.T. 2/17/23, 87-88). On October 5, 2021, his emotional support teacher observed Ryan write that he wanted to engage in self-harm, and his teacher referred him to the school counselor. AR Doc. 4-3 at 12 (Decision, 11). The counselor conducted a youth suicide risk

screening. *Id*. The counselor recommended that the student see the student's outside therapist or a local mental health center immediately. *Id*.

On October 6, 2021, the counselor and the prevention specialist met with Ryan and told him that one of them would meet with him once each week. *Id*. They reminded him that he had a full-time guidance pass to come see them anytime that he needed. *Id*. However, Ryan used the student's guidance pass only approximately three times. *Id*. at 13.

**5.    At an October 12, 2021 IEP meeting (in sixth grade) following new suicidal ideations, the School District proposed only nominal changes to his IEP.**

As the year progressed, Ryan's social-emotional and behavioral struggles worsened. On October 12, 2021, Ryan's parents participated in an IEP meeting. AR Doc. 4-3 at 13 (Decision, 12). At the time of this IEP meeting, his parents reported that Ryan was feeling unsafe at school, that the school was too big for him, and that he was overwhelmed. AR Doc. 4-8 at 764 (10/12/21 IEP). The Parents also reported that he was having difficulty making friends at Marsh Creek. AR Doc. 4-3 at 13 (Decision, 12). The Parents also expressed concern that the Marsh Creek Center may not be the right placement for Ryan. AR Doc. 4-8 at 764 (10/12/21 IEP).

The District proposed a few additions to Ryan's IEP, including weekly meetings with the counselor or prevention specialist, morning check-ins, and a pass to go to the counselor when needed. AR Doc. 4-8 at 753 (10/12/21 IEP). No other changes were made to his IEP at this time, including no changes to the goals, behavior plan, or his placement in an itinerant learning support setting.

No positive response or improvement was observed in Ryan following the implementation of these revisions to the IEP. AR Doc. 4-7 at 24 (N.T. 2/17/23, 88-89). Sadly, on October 18, 2021, Ryan again suffered suicidal ideations. AR Doc. 4-3 at 13 (Decision, 12). The District completed

a suicide risk monitoring assessment. *Id*.

On November 10, 2021, the parties met for another IEP meeting in response to the Parents' request that Ryan attend the Downingtown Cyber Academy ("DCA") as Ryan could not continue at Marsh Creek due to his ongoing deteriorating social-emotional and behavioral issues. *Id*. at 14. The District denied the Parents' request for full-time enrollment in DCA and would only agree to part-time attendance. AR Doc. 4-7 at 24 (N.T. 2/17/23, 89-90). The IEP also included some additional time in a Functional Strategies class, which decreased Ryan's time in the regular education environment by a total of 13%, from 96% to 83%. AR Doc. 4-8 at 882 (11/10/21 IEP). The Parents also requested consideration of other programs operated by the Chester County Intermediate Unit ("CCIU"), including the Gateway Program and TEACH. AR Doc. 4-7 at 24 (N.T. 2/17/23, 89-90). The District rejected those options.

The Parents ultimately decided that the IEP offered by the School District did not meet Ryan's needs, and notified the District on November 14, 2021, that Ryan had been accepted into a private school, and that they were withdrawing him from the District. AR Doc. 4-3 at 15 (Decision, 14).

In response to Ryan's withdrawal, Sallie Seidel, Supervisor for Special Education for the District, sent the Parents a letter on November 15, 2021, indicating that the District believes it has provided Ryan a FAPE and would not fund a private school placement. AR Doc. 4-8 at 895 (11/15/21 ltr. from Dist. to Family). The letter also indicated that the Parents have a right to request a multidisciplinary reevaluation and/or an IEP meeting. *Id*. The Parent reached out to Ms. Seidel after receiving the letter and expressed concern over how a reevaluation or IEP would be helpful to Ryan at this point, given the District's inability to meet his social-emotional needs, and asked if the District could further explain. AR Doc. 4-8 at 897. Ms. Seidel responded by stating that the

13

District sends that form letter out to all parents of students with disabilities when they disenroll from the District to attend private school. *Id.*

The Parents reached out again to Ms. Seidel on February 15, 2022, asking about the previously offered psychiatric evaluation and whether the District could still complete that assessment even though Ryan was no longer attending school in the District. AR Doc. 4-8 at 898-99 (Emails between Family and District). Ms. Seidel stated that he could be evaluated and that she asked that he be placed on the waiting list for the evaluation. *Id.* The Parents asked to be informed when the evaluation would be possible, but the District never scheduled an evaluation.

On November 15, 2021, Ryan began attending The Concept School ("TCS"). AR Doc. 4-3 at 15 (Decision, 14). The Hearing Officer found that Ryan made progress at The Concept School and that The Concept School ("TCS") was an appropriate placement for Ryan. AR Doc. 4-3 at 19, 30-31 (Decision, 18, 29-30).

> **6.     The Family obtained a comprehensive Neuropsychological Evaluation by Drs. Mary Lazar and Meghan DeVries, who recommended a continued placement at the Concept School.**

The Parents obtained a Neuropsychological Evaluation by Drs. Mary Lazar and Meghan DeVries at Developmental Neuropsychology Associates in March of 2022. AR Doc. 4-8 at 942-62. (Neuropsychological Evaluation). A final report was provided to the Family on June 30, 2022, and the Family provided the report to the District on July 14, 2022. AR Doc. 4-7 at 35 (N.T. 2/17/23, 134).

Dr. Lazar's and Dr. DeVries's evaluation was thorough and comprehensive, and included a review of records from Ryan's time in the School District; a review of records from TCS, a parent interview and developmental questionnaire, an observation at TCS, the completion of parent and teacher rating scales, and the administration of a variety of assessment tools.

14

Assessments administered by Dr. Lazar and Dr. DeVries included the Wechsler Intelligence Scale for Children, Fifth Edition ("WISC-V"), Wide Range Assessment of Memory and Learning, Third Edition ("WRAML-3"), the California Verbal Learning Test ("CVLT-C"); the Rey Complex Figure Test; the Conners Continuous Performance Test; the Delis-Kaplan Executive Functioning System ("D-KEFS"); the Kaufman Test of Educational Achievement, Third Edition ("KTEA-3"), the CDI-2; the Multidimensional Anxiety Scale for Children, Second Edition ("MASC-2"); the BASC-3; the Behavior Rating Inventory of Executive Functioning, Second Edition ("BRIEF-2"); and the Autism Spectrum Rating Scales ("ASRS").

The results demonstrated that Ryan continued to show overall average cognitive functioning. *Id*. at 953. Consistent with previous testing and observation by District teachers, Ryan showed difficulties in the areas of higher-level reading comprehension and written expression. Id. at 952, 955. Testing also revealed ongoing social-emotional and behavioral deficits. However, a comparison of the BASC-3 rating scales completed by Ryan's mother and teachers as part of Dr. Lazar's and Dr. DeVries's evaluation with the Parent and teacher rating scales completed when Ryan was in the District, shows a marked decrease in overall social-emotional and behavioral problems after the transition to TCS. *Id*. at 961-62.

Dr. Lazar and Dr. DeVries provided the following diagnoses: Autism Spectrum Disorder, Generalized Anxiety Disorder, Unspecified Depressive Disorder, and ADHD. *Id*. at 943

The report includes a variety of academic, social-emotional, and behavioral recommendations and educational needs for Ryan. Dr. Lazar and Dr. DeVries concluded that the results of their evaluation fully support Ryan's placement at TCS, and that in the smaller environment of TCS, which is critical to be able to address Ryan's autism-related needs, Ryan's academic and social-emotional needs are being met. *Id*. at 943-46. Nothing about the results of the evaluation caused

15

any concern or pause for the appropriateness of TCS for Ryan for Dr. Lazar or Dr. DeVries. AR Doc. 4-7 at 311 (N.T. 2/11/23, 311).

In response to receiving a copy of the report by Dr. Lazar and Dr. DeVries, the District informed the Parents on July 18, 2022, that it would be in touch about setting up a meeting. AR Doc. 4-8 at 941 (Email from District to Parent).

The Parents heard nothing from the District. Therefore, close to a month later, the Parents' provided notice to the District on August 15, 2022, of their intent to maintain Ryan's placement at TCS for seventh grade and requested the School District fund that placement. AR Doc. 4-3 at 17 (Decision, 16). In response to this notice, the District scheduled an IEP meeting for August 22, 2022, and the Parents also made Ryan available for baseline testing by the District. *Id*.

The resulting August 22, 2022 IEP continued to offer the same social-emotional and behavioral goals from the District's previous IEPs that were in place in the middle of fourth grade and relied on the old baseline data, as well as the same behavior plan from previous IEPs instead of updating with new data from The Concept School. AR Doc. 4-8 at 1001-03, 1009-11 (8/2022 IEP). Similarly, much of the specially designed instruction and accommodations are the same as previous IEPs. The IEP did, however, finally include some new goals and increased the amount of support periods/classes Ryan would receive. The District proposed a supplemental level of support at Downingtown Middle School, where Ryan would be placed in the regular education environment for 75% of his day. *Id*. at 1021; AR Doc. 4-3 at 18 (Decision).

Downingtown Area Middle School has approximately 1,100 students with a class size of approximately 25 students. AR Doc. 4-6 at 45 (N.T. 4/3/23, 546). Some of the Parents' concerns over the August 2022 IEP included the overall size of the school and the size of his classes given Ryan's demonstrated need for a smaller class size and smaller school environment. AR Doc. 4-7

16

at 26 (N.T. 2/17/23, 97-99). The Parents were also concerned that Ryan's instruction in social-emotional and executive functioning was occurring in separate functional classes, where at TCS he receives that instruction in the moment in all of his classes, which is possible due to the small class size at TCS. *Id*. Receiving instruction in the moment is critical for Ryan to generalize skills and be successful. *Id*. Ryan has a history of difficulty with generalizing skills learned in separate functional skills classes to other settings. Receiving instruction "in the moment" assists Ryan with the generalization of skills. *Id*.

The Parents ultimately rejected the August 22, 2022, IEP as inappropriate, and continued Ryan's placement at TCS for the 2022-23 school year. Although the Parents signed the TCS contract for the 2022-23 school year on April 20, 2022, they were able to cancel the contract at any time prior to the start of the 2022-23 school year, with their financial liability being limited to the loss of a $350.00 deposit. *Id*. at 25-26, 79 (N.T. 2/17/23, 94-95, 309-10).

## IV.   STANDARD OF REVIEW

### A.   IDEA

This Court is required to undertake a fully independent review of the record and the hearing officer's decision. *Rowley v. Board of Educ.*, 458 U.S. 176, 206-07, 102 S.Ct. 3034, 3050-51 (1982). A district court: (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate. 20 U.S.C. § 1415(i)(2)(B).

The Third Circuit requires "a district court to apply a nontraditional standard of review when considering an appeal from a state administrative decision under IDEA." *Mary Courtney T. v. Sch. Dist. of Philadelphia*, 575 F.3d 235, 241 (3d Cir. 2009). It is called "modified de novo"

17

review because it "differs substantively from judicial review in other agency actions, in which the courts are generally confined to the administrative record and are held to a highly deferential standard of review." *Susan N. v. Wilson School District*, 70 F.3d 751, 757 (3d Cir. 1995).

In conducting modified de novo review, district courts give "due weight" to the factual findings of the administrative agency. *S.H. v. School District of Newark*, 336 F.3d 260, 269 (3d Cir. 2003). "Due weight" means that although the district courts must consider the administrative fact findings, the courts are free to reject such findings. *Id*. at 269-70. Thus, when reviewing an administrative proceeding in an IDEA case, the district court should "defer to the hearing officer's factual findings," unless it can point to contrary non-testimonial extrinsic evidence in the record. *Carlisle Area School District v. Scott P.*, 62 F.3d 520, 529 (3d Cir. 1995). If the Court does not accept these factual findings, it needs to explain why. *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004).

Although this matter involves the appeal of an administrative hearing, the modified de novo standard of review is not similar to the highly deferential standard of review typical in administrative appeals; in fact, the Third Circuit has held that it is hardly deferential at all:

> Perhaps if the Hearing Officer's factual conclusions were entitled to increased deference, such as clear error review, the District Court's reversal as to the weight of the . . . [evidence] would be more of a problem. But the "modified de novo" standard does not actually restrict . . . [a] [c]ourt's power to reach its own conclusions . . . . based on the preponderance of the evidence. This [standard of review] merely requires it to explain its disagreements with the Hearing Officer . . . .

*Culley v. Cumberland Valley School District*, 758 F. App'x 301, 305 (3d Cir. 2018).

**B.    Section 504**

The modified de novo review standard does not apply to Section 504 claims. Rather, a district court applies a de novo standard of review, unlike the modified de novo standard of review applicable to the IDEA claims. *K.N v. Gloucester City Board of Education*, 379 F. Supp. 3d 334,

18

344 (D.N.J. 2019) (*citing T.F. v. Fox Chapel Area Sch. Dist.*, 589 F. App'x 594, 598 (3d Cir. 2014)). The modified de novo standard stems from an interpretation of IDEA, not Section 504. *Id*.

## V.    SUMMARY OF THE ARGUMENT

The Hearing Officer denied the Family their right to a fair hearing when he unfairly limited the Family's examination of their expert witness to 10 minutes; limited the examination of all other witnesses to 60 minutes; criticized the Family's expert for not observing Ryan in the District's schools, even though Ryan was no longer going to school in the District; repeatedly downplayed the student's suicidal plan as "negative self-talk;" and failed to provide meaningful citations to the record to support his findings.

Ryan is entitled to full days of compensatory education from October 24, 2020, through November 15, 2021, because the District failed to provide appropriate supports and services to meet his social and emotional needs. The IEPs developed by the District during the time period at issue failed to meaningfully address all of Ryan's needs and essentially repeated his goals, specially designed instruction, and related services from year to year. Clearly, Ryan was not making meaningful educational progress with respect to his severe emotional needs. His IEPs were inappropriate and resulted in a denial of FAPE. Because his social and emotional needs permeated his entire school day, Ryan is entitled to full days of compensatory education.

The Family is entitled to tuition reimbursement at the Concept School. The School District failed to offer Ryan a FAPE through its November 2021 and August 2022 IEPs. Despite Ryan's worsening emotional needs, in November of 2021, the District repeated the goals, behavior plan, and placement contained in previous IEPs. Thereafter, its August 2022 IEP failed to meaningfully revise the District's November 2021 IEP. The August 2022 IEP in fact contained the same social-emotional and behavioral goals that had been in Ryan's IEPs since the middle of his fourth-grade

year (the 2019-2020 school year).

Equitable considerations support a tuition award. The Family repeatedly voiced their concerns, participated in the IEP process, and gave the School District ample opportunity to amend Ryan's IEP to provide him with appropriate services to support his social and emotional needs. Yet the School District repeatedly failed to do so. Equitable considerations clearly favor a tuition award.

## VI.    ARGUMENT

### A.    The Family was not afforded a fair and impartial due process hearing by the Hearing Officer.

IDEA guarantees children with disabilities and their parents a fair and impartial due process hearing. However, here, Hearing Officer Gerl denied the Family this right when he unfairly limited the Family's examination of its expert witness to 10 minutes; limited all other witness testimony to one hour; criticized the Family's expert for not observing Ryan in the School District's schools, even though Ryan was no longer attending school in the District; repeatedly downplayed the student's suicidal plan as "negative self-talk;" and failed to provide meaningful citations to the record to support his findings. The Family respectfully requests that the Court disregard the Hearing Officer's unsupportable findings of fact, credibility determinations, and conclusions of law, and independently review this matter de novo.

Under IDEA, the parents of a child with a disability have a right to an impartial due process hearing, independent of their child's right to receive a FAPE. *Winkelman ex rel Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 527, 531, 127 S. Ct. 1994, 2002, 2004 (2007) (*citing* 20 U.S.C. § 1415(e)(2)(A)(ii)); 34 C.F.R. § 300.511(a) ("Whenever a due process complaint is received . . . the parents or the LEA involved in the dispute must have an opportunity for an impartial

20

due process hearing . . . .”). “Regulations promulgated under IDEA entitle parents dissatisfied with their child’s IEP to ‘an impartial due process hearing.’” *Carlisle Area School v. Scott P. by and through Bess P.*, 62 F.3d 520, 527 (3d Cir. 1995) (*quoting* 20 U.S.C. § 1415(b) & 34 C.F.R. § 300.506-512); 20 U.S.C. § 1415(f)(1)(A); *see also Board of Educ. v. Rowley*, 458 U.S. 176, 102 S. Ct. 3034 n.16 (1982) (parents are entitled to “receive a hearing before an independent hearing officer). IDEA requires a hearing system administered by well-trained, independent hearing offic- ers. 20 U.S.C. § 1415(f)(3)(A). The hearing officer is required to not only be knowledgeable of IDEA and related special education laws, but must also “possess the knowledge and ability to conduct hearings in accordance with appropriate, standard legal practice . . . .” 20 U.S.C. § 1415(f)(3)(A)(ii), (iii).

“[A]n ‘impartial’ [hearing officer] . . . is to conduct the [hearing] . . . and . . . such officer . . . should make an ‘independent’ decision.” *Carlisle Area School*, 62 F.3d at 527 (*quoting* 34 C.F.R. § 300.510). On appeal to Federal Court, “district courts have discretion to determine how much deference to accord the administrative proceedings . . . .” *Id*. (*citing Oberti v. Board of Edu- cation*, 995 F.2d 1204, 1219 (3d Cir. 1993)).

The Family failed to receive an independent, impartial due process hearing in violation of 20 U.S.C. § 1415(f) because Mr. Gerl inexplicitly diverted from appropriate, standard legal prac- tice when he limited the Family’s direct examination of the Family’s expert witness to 10 minutes while not limiting the District’s cross examination of the witness. *See* 34 C.F.R. § 300.512(a)(2) (“Any party to a hearing . . . has the right to . . . present evidence and confront, cross-examine, and compel the attendance of witnesses . . . .”); *see also Doe v. University of Sciences*, 961 F.3d 203, 214 (3d Cir. 2020) (right of cross-examination is fundamental in educational context); *see also* AR Doc. 4-6 at 4 (N.T. 4/3/23, 384) (limiting direct to 10 minutes); AR Doc. 4-6 at 13 (N.T. 4/3/23,

21

419) (limiting redirect).

Initially, the Hearing Officer was not going to permit the Family *any* redirect examination of its expert witness, but relented and permitted a brief redirect AR Doc. 4-6 at 13 (N.T. 4/3/23, 419) (limiting redirect). In contrast, he permitted all School District employees to have one hour of direct examination for all of the District's witnesses. *See* AR Doc. 4-7 at 46 (N.T. 2/17/23, 177) (warning Family's counsel that the emotional support teacher, Sally Falkner, who the Family called on direct, had 25 minutes left to testify); AR Doc. 4-7 at 53 (N.T. 2/17/23, 205) (warning counsel for the District that she had 25 minutes left to cross examine Ms. Falkner); AR Doc. 4-7 at 67, 72 (N.T. 2/17/23, 259-60, 279) (warning Family's counsel that he used 47 minutes of his allotted 60 minutes to examine Allison Hill, an emotional support teacher); AR Doc. 4-6 at 15-16 (N.T. 4/3/23, 433-34) (warning School District counsel that she had 30 minutes remaining to examine the District's school counselor). Even if they are not formally qualified as experts during a due process hearing, teachers, counselors, and administrators are *de facto* experts in the field of education—if they are not experts then they should not be teaching and counseling children with disabilities. Yet, here, Mr. Gerl permitted an hour of direct examination of each School District employee, but only 10 minutes of examination for the Family's expert.

He limited and strictly enforced Ryan's mother's testimony to 60 minutes, repeatedly warning counsel for the Family how many minutes the mother had left to make her case. AR Doc. 4-7 at 20, 23, 26 (N.T. 2/17/23, 71, 85, 95) (warning that his mother had 35, 17, and 5 minutes left, respectively)). Because the mother testified for 60 minutes on direct examination, when it came time for redirect Mr. Gerl told the Family's counsel: "unfortunately, [you are] . . . out of time." *Id*. at 36 (N.T. 10/4/23, 137). But the Hearing Officer reluctantly permitted a three minute redirect. *Id*.

The Family had the burden of proof at the due process hearing. While the Family was essentially only calling three witnesses, Mr. Gerl allowed the Family only two hours and 10 minutes to put on its case and meet its burden of proof; such conduct is patently unfair and in contravention of appropriate, standard legal practice. *See* 20 U.S.C. § 1415(f)(3)(A)(ii), (iii).

Furthermore, he demonstrated a clear bias against the Family and their complaints that Ryan was exhibiting serious emotional needs that required a different and more supportive placement. In his Decision, he criticized the Family's expert for not observing Ryan in the School District's schools. AR Doc. 4-3 at 16 (Decision). However, the Parents retained the psychologist *after* Ryan enrolled at TCS. Thus, it was *obviously impossible* for the private psychologist to observe Ryan in a classroom in the School District. Furthermore, he downplayed Ryan's repeated suicidal ideations, referring to his desire to kill himself as "negative self-talk." And the Hearing Officer continuously implied that because the student expressed suicidal ideations at home and not at school, his emotional needs were somehow not relevant to his education, and proceeded to essentially "blame the parents":

- "The student stated he wants to kill himself *when the student is at home*." AR Doc. 4-3 at 8 (Decision, 7) (emphasis supplied).

- "At the January 5, 2021 IEP team meeting, a crisis plan, extra check-ins with the student's emotional support teacher and counseling services were added to the student's IEP to address the student's *negative self-talk*, thoughts of self-harm and issues with depression." *Id*. at 9 (emphasis supplied).

- "The school district *staff did not see these behaviors at school* except for one instance in October of 2022 where the student hit the student's self with the student's lunch bag." *Id*. at 9 (emphasis supplied).

- "The school district staff did not observe school avoidance behaviors while the student was in school." *Id.* at 14.

- "When the student engaged in *negative self-talk*, the school district included a prevention specialist and various check-ins for the student." *Id*. at 25 (emphasis supplied).

23

- "When the student made comments about hurting himself *related to problems the student was experiencing at home . . . .*" *Id*. (emphasis supplied).

- "The student was telling the parents *at home* that the student did not want to go to school, but the school district staff was not observing any such issues while the student was at school." *Id*. at 25-26 (emphasis supplied).

- "The unique individual circumstances of this student include the student's statements that he wanted to harm himself *because of issues at home*." *Id*. at 26 (emphasis supplied).

- "When the student made concerning statements—including wanting to hurt himself *because of problems at home . . . .*" *Id*. at 27 (emphasis supplied).

Furthermore, the Hearing Officer made factual findings and legal conclusions without accurate citations to the record in violation of 20 U.S.C. § 1415(f)(3)(A)(iv) (Hearing officer "must possess the knowledge and ability to render and write decisions in accordance with appropriate, standard legal practice."). For example, without accurate citation to the record, the Hearing Officer concluded, incorrectly, that Ryan "made significant progress with the student's ability [sic] to self-regulate and demonstrate appropriate social skills." AR Doc. 4-3 at 8 (*citing generally* "J-14 and J-15"). Exhibit J-14 is the January 13, 2020 IEP and is 61 pages in length. Exhibit J-15 is the 2020 RR, which is 30 pages in length. The Hearing Officer failed to provide any pinpoint citation to these 91 pages of exhibits to support his crucial factual and legal conclusion that Ryan "made significant progress." Such a broad, vague, and meaningless "citation" is tantamount to no reference to the record at all. This factual finding and legal conclusion must be disregarded by the Court.

Mr. Gerl claimed, again without citation to authority, that "[o]n December 11, 2020, an IEP team meeting was held to review the results of the Columbia – Suicide  Severity Rating Scale and to provide additional supports, including the student seeing a prevention specialist once per week." AR Doc. 4-3 at 8 (Decision, 7). Mr. Gerl's unsupported opinion is belied by the record. Although the Parents were aware that Ryan verbalized a desire to commit suicide, the Parents were not

24

advised that the CSSRS was completed or provided a copy until the due process hearing. AR Doc. 4-7 at 18 (N.T. 2/17/23, 63-65).

The Hearing Officer yet again provided an unsupported conclusion that Ryan "made significant progress" without providing a meaningful citation to the record: "The student subsequently made significant progress with the student's ability to self-regulate and demonstrate appropriate social skills." AR Doc. 4-3 at 8 (Decision, 7) (*citing generally* J-14, J-15). Again, Joint Exhibits 14 and 15 consist of 91 single-spaced pages. A jurist cannot cite to 91 single-spaced pages covering a wide range of topics in support of the specific, crucial factual finding. Neither the citatio" nor the proposition it purports to support are reliable. Mr. Gerl's conclusion that Ryan "made significant progress" must be rejected by this Court as it is belied by the record.

The Hearing Officer concluded that Ryan "made progress" towards his IEP goals in the first semester of the 2021-22 school year; but the Hearing Officer did not provide a specific citation to the record to support that claim:

> During the first semester of the 2021 – 2022 school year, the student made progress on the student's IEP goals. The student received grades of A and B in all of the student's academic classes.

AR Doc. 4-3 at 15 (*citing* J-31, J-39, J-41, J-45). Joint exhibit 31 is a 66-page IEP; exhibit 39 is a 17-page Communications Chart; exhibit 41 is an 11-page Progress Report; and exhibit 45 is a 59-page IEP. Whether Ryan made meaningful progress is a critical issue in this case, yet Mr. Gerl simply referenced generally to 153 pages without further specificity to support his finding that Ryan made progress.

The unfair limitation of the Family's direct examination of its expert witness violated the basic tenets of due process and is reversable error in and of itself. Furthermore, it, along with the unfair criticism of the Family's expert witness, the repeated downplaying of Ryan's suicidal

ideations, and Mr. Gerl's failure to provide meaningful citations to the record demonstrated the Hearing Officer's predisposition against the Family and his contravention of appropriate, standard legal practice. The Family did not receive a fair and impartial due process hearing under these circumstances. The Family respectfully requests that this Court give no weight to the Hearing Officer's factual findings or legal conclusions and rather review this matter de novo, which is this Court's prerogative in any event. *Culley*, *supra*, 758 F. App'x at 305.

**B.      Ryan is entitled to full days of compensatory education from October 24, 2020, through November 15, 2021, because the School District failed to provide appropriate supports and services to meet his social and emotional needs.**

The IEPs developed by the School District during the time period at issue failed to meaningfully address all of Ryan's needs and were therefore inappropriate and resulted in a denial of FAPE. Ryan failed to progress with respect to his social and emotional needs. Because his social and emotional needs permeated his entire school day, Ryan is entitled to full days of compensatory education.

"The express purpose of . . . [IDEA] is to 'ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs . . . .'" *Forest Grove School Dist. v. T.A.*, 557 U.S. 230, 244-45, 129 S. Ct. 2484, 2494 (2009) (*citing* 20 U.S.C. § 1400(d)(1)(A); *School Comm. of Burlington v. Department of Ed. of Mass.*, 471 U.S. 359, 369-70, 105 S.Ct. 1996 (1985)). School districts have a continuing obligation to properly evaluate and accurately identify all students who are reasonably suspected of having a disability and offer a FAPE to every disabled student through an IEP. 34 C.F.R. § 300.323.

The United States Supreme Court in *Endrew F. v. Douglas County School Dist. RE-1*, 580 U.S. 386, 137 S. Ct. 988 (2017) emphasized that IDEA requires more than a program reasonably

26

calculated to allow a student to make "some progress;" rather an "educational program must be appropriately ambitious in light of his circumstances," as minimal "progress from year to year can hardly be said to have been . . . an education at all . . . ." *Id.* at 1000-01.

While declining to adopt a "bright-line" regarding the appropriateness of an IEP, the Court made clear that an IEP must be judged under the child's factual circumstances, and that the program must be appropriately ambitious in light of the child's potential. *Id*. In addition, "every child should have the chance to meet challenging objectives." *Id.* at 999-1000; *see also Rowley*, *supra*, 458 U.S. at 203, 102 S.Ct. at 3049 n.25 ("We do not hold today that every handicapped child who is advancing from grade to grade in a regular public school system is automatically receiving a 'free appropriate public education.'").

The progress standard set forth in *Endrew F.* expands upon the standard that has been applied for many years in this Circuit, requiring that a student must receive an IEP that is reasonably designed to allow a student to make meaningful educational progress and achieve "significant learning." *K.D. v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 254 (3d Cir. 2018); *Brandywine Heights Area School Dist. v. B.M.*, 248 F. Supp. 3d 618, 632 (E.D. Pa. 2017).

In addition, an "appropriate" educational program—the "A" in FAPE—extends beyond academic skills, and includes the social, emotional, and physical progress necessary to move the child towards independence and self-sufficiency consistent with the child's cognitive potential. *E.P. by & through Allison H.-P. v. Twin Valley Sch. Dist.*, 517 F. Supp. 3d 347, 349 (E.D. Pa. 2021). Courts in this Circuit have cautioned against focusing only on a student's academic progress while diminishing or ignoring behavioral, emotional, and social needs. *See Jana K. v. Annville-Cleona Sch. Dist.*, 39 F. Supp. 3d 584, 595 (M.D. Pa. 2014) ("[FAPE] extends beyond discrete academic skills and includes the social, emotional, and physical progress necessary to move the child toward

27

meaningful independence and self-sufficiency"); *Council Rock S.D. v. M.W.*, 2012 WL 3055686 at *7 (E.D. Pa. July 26, 2012) (school district denied student FAPE by failing to evaluate student for behavioral and emotional needs and failing to program for those needs). Thus, for an IEP to be appropriate, it must offer a child the opportunity to make progress that is "meaningful" in all relevant domains under the IDEA, including academic, behavioral, social, and emotional. *S.H. v. State-Operated School Dist.*, 336 F.3d 260, 265 (3d Cir. 2003); *see also R.B. v. Downingtown Area Sch. Dist.*, 509 F. Supp. 3d 339, 347 (E.D. Pa. 2020) ("Where a student's behavioral problems are impeding [his or her] ability to learn, and the school district fails to address those problems in an appropriate way, such a failure may constitute a denial of FAPE."); *Norristown Area School District v. Frank C.*, 2014 WL 11370484 at *6 (E.D. Pa. Aug. 7, 2014) ("[A]cademic progress does not itself demonstrate that [a student] . . . received a FAPE.").

When crafting IDEA, Congress valued social, emotional, behavioral, and functional performance equally with traditional academic performance. 20 U.S.C. § 1414(a)(2)(A)(i) ("A local educational agency [("LEA")] shall ensure that a reevaluation of each child with a disability is conducted . . . if the [LEA] determines the educational or related service needs, including improved academic achievement and functional performance, of the child warrant a reevaluation."); § 1414(b)(2)(A)(i), (ii) ("In conducting the evaluation, the [LEA] shall use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information . . . that may assist in determining whether the child has a disability[] and the content of the child's [IEP.]"); § 1414(b)(3)(A)(ii) ("Each [LEA] shall ensure that assessments and other evaluation materials used to assess a child . . . are provided and administered in the language and form most likely to yield accurate information on what the child knows and can do academically, developmentally, and functionally . . . ."); § 1414(c)(5)(B)(ii) (an LEA must provide a "summary of the

28

child's academic and functional performance" to a parent if the LEA is terminating services under IDEA); § 1414(d)(3)(A)(iv) ("In developing each child's IEP, the IEP Team . . . shall consider . . . the academic, developmental and functional needs of the child"); § 1414(d)(1)(A)(i)(I), (II), (VI)(aa) (a child's IEP must include "a statement of the child's present levels of academic and functional performance[,] . . .a statement of measurable annual goals, including academic and functional goals[, and] . . . a statement of any individual appropriate accommodations that are necessary to measure the academic achievement and functional performance of the child . . . .").

For example, an IEP is substantively inappropriate where a child exhibits significant behavioral needs, and a school district fails to conduct a Functional Behavioral Assessment ("FBA") because the lack of an FBA leads to the development of a deficient behavior improvement plan ("BIP"). *C.F. ex rel R.F. v. New York City Dept. of Educ.*, 746 F.3d 68, 81 (2d Cir. 2014); *see also Upper Darby School District v. K.W.*, 2023 WL 4826736 (E.D. Pa. July 27, 2023) (denial of FAPE for failure to create a Positive Behavior Support Plan ("PBSP") supported by an FBA). The court in *C.F.* held that the deficient BIP had an adverse impact on the IEP team's placement decision and prevented the parents from making an informed choice concerning their child's placement. 746 F.3d at 81-82.

Similarly, in *K.W.*, the student was exhibiting significant behaviors such as "shouting obscenities three times a week, hitting and kicking an average of 1.8 times per week, and eloping from the classroom an average of three times per week[,]" but the district did not amend his IEP to include a PBSP to address these behaviors. 2023 WL 4826736 at *3. Even when proposing a new IEP and placement, his school district "did not include any goals related to K.W.'s social-emotional skills, behavior, or self-regulation." *Id.* The court held that the "[s]chool-[w]ide PBSP rather than an individualized PBSP based on a functional assessment of behavior" denied the

29

student a FAPE. *Id*. Ultimately, the court held that the school district denied K.W. a FAPE because "(1) K.W. had behavioral needs over the 2020-21 school year that were not addressed in his IEP and (2) an individualized PBSP based on an FBA would have been significantly beneficial in documenting and identifying antecedent behaviors (triggers), assessing the perceived function of those concerning actions, and creating strategies to cogently correct those behaviors." *Id*. at *7.

Likewise, in *Frank C.*, *supra*, the court held that the school district failed to provide appropriate behavioral support to the plaintiff, who was a child on the Autism spectrum. 2014 WL 11370484 at *6-*7. The court affirmed the hearing officer's finding that "the school district denied [the student] . . . a FAPE during the entirety of . . . [his second grade] year by failing to assess his behavioral needs and then address them through an IEP." *Id*. at *6 (internal quotation marks omitted). The court awarded compensatory education to the family despite the fact that the child "made academic progress in math and reading." *Id*.

Here, Ryan failed to make meaningful educational progress with respect to his social and emotional needs from October 24, 2020 through November 15, 2021. Like the plaintiff in *Council Rock S.D., supra*, the School District denied Ryan a FAPE by failing to appropriately program for his social and emotional needs and by refusing to update his IEP in the face of serious and escalating emotional needs, including suicidal ideation. Ryan clearly deteriorated emotionally over fifth and sixth grade. The Hearing Officer erred by overvaluing Ryan's strong reading and math skills and good grades at the expense of his increasing emotional needs:

- Ryan was offered a FAPE because he "matured" during his fifth grade year and performed "average to well above average" on the Aimsweb National Reading Assessment. *See* AR Doc. 4-3 at 8 (Decision, 7).

- "The student received A's in all of the student's classes for fifth grade, and the grades were determined by using the same rubric that was used for the student's nondisabled peers." *Id*. at 10.

- "During the first semester of the 2021 – 2022 school year, the student made progress on the student's IEP goals. The student received grades of A and B in all of the student's academic classes." *Id*. at 15.

- "The student also succeeded academically, receiving grades of 'A' in all of the student's classes without modifications to the curriculum." *Id*. at 25.

Although Ryan has a history of social-emotional and behavioral difficulties, those negative behaviors increased dramatically at the start of the 2020-21 school year during virtual instruction. AR Doc. 4-7 at 16 (N.T. 2/17/23, 55); AR Doc. 4-6 at 36 (N.T. 4/3/23, 510-12). Ryan would engage in tantrum-like behaviors, throw chairs, break windows and televisions, punch holes in the wall, and bang his head on the wall. AR Doc. 4-7 at 16 (N.T. 2/17/23, 57); AR Doc. 4-8 at 189, 192, 200, 202 (emails between District and Family). He also began expressing that he wanted to die. AR Doc. 4-8 at 189, 192, 200, 202, 205, 234 (emails between District and Family); AR Doc. 4-7 at 19 (N.T. 2/17/23, 68-69). These increased behaviors were shared with the District, but it did not add modifications or supports to his IEP in the fall of 2020 (fifth grade).

He transitioned to a four-day per week in-person hybrid program in October of 2020, and he quickly began experiencing difficulties in school related to anxiety and depression, including regular peer conflicts. AR Doc. 4-8 at 227-31, 233-35 (emails between District and Family); AR Doc. 4-7 at 17 (N.T. 2/17/23, 60-61). These difficulties occurred despite having only 10 students in his class. AR Doc. 4-7 at 17 (N.T. 2/17/23, 60). In fact, Ryan began engaging suicidal ideation at school on multiple occasions where he expressed a desire to kill himself related to stress at school. AR Doc. 4-8 at 325-30 (CSSRS); AR Doc. 4-7 at 18 (N.T. 2/17/23, 63-65). Although the District did convene an IEP meeting about a month after he began making such statements, the only revision to the IEP made was to add six weekly check-ins with a prevention specialist, which ultimately was not implemented by the District, so his special education teacher and guidance counselor were forced to initially conduct the check-ins. AR Doc. 4-8 at 344 (12/11/20 IEP); AR

31

Doc. 4-7 at 19-20 (N.T. 2/17/23, 70-71).

While the District did complete a revaluation in response to parental concerns, the resulting December 2020 RR consisted primarily of only one of 16 academic achievement subtests in reading comprehension, the administration of a single parent and single teacher BASC-3 rating scale, and the self-report on the CDI-2. AR Doc. 4-8 at 391, 404-08 (December 2020 RR). No further in-depth assessment of Ryan's social-emotional or behavioral functioning was undertaken. *Id*. There was no new FBA completed, despite the last FBA being done almost five years earlier in early 2016. Despite Ryan's suicidal ideation, no psychiatric evaluation was done or offered at this time. *Id*.

The January 5, 2021, annual IEP repeated Ryan's social-emotional and behavioral goals, with the same level of achievement as in the previous January 2020 IEP, indicating minimal progress at best. *Compare* AR Doc. 4-8 at 135-36, 138 (1/2020 IEP) *with* AR Doc. 4-8 at 453-55 (1/2021 IEP). Ryan's behavior plan also remained unchanged, as did most of the specially designed instruction and supports. *Compare* AR Doc. 4-8 at 139-43 (1/2020 IEP) *with* AR Doc. 4-8 at 456-58 (1/2021 IEP). Despite Ryan's needs stemming from his autism and emotional disturbance, the January 2021 IEP continued Ryan's placement in itinerant learning support where Ryan participated in the large regular education environment for approximately 96% of his day. AR Doc. 4-8 at 467 (1/2021 IEP). The District made only minimal changes to Ryan's program for the remainder of the school year and Ryan continued to struggle.

The Parents were concerned for Ryan's transition to the very large Marsh Creek Sixth Grade Center where all sixth-grade students in the District attended resulting in class sizes as high as 29 students. AR Doc. 4-7 at 59 (N.T. 2/17/23, 230). Given their concerns, during a transition meeting held on May 21, 2021, the Parents expressed their perspective on Ryan's struggles and

32

the kinds of supports he needed. J-22, at 5-7; AR Doc. 4-7 at 22-23 (N.T. 2/17/23, 80-83) AR Doc. 4-6 at 22 (N.T. 4/3/23, 445-47).

Unfortunately, early in Ryan's sixth grade year, his social-emotional functioning quickly deteriorated. AR Doc. 4-7 at 23 (N.T. 2/17/23, 138-139). Within the first month of school, Ryan expressed to his Parents that he did not want to go to school at Marsh Creek. *Id*. at 24 (N.T. 2/17/23, 87). He began wetting the bed three to four times a week and would have panic attacks before school where he would hyperventilate, shake, and cry. *Id*. at 24-25 (N.T. 2/17/23, 86-87). Most nights at bedtime he would cry and say that he did not want to go to school. *Id*. Ryan also began engaging in suicidal ideation and statements again both at school and at home. *Id*. at 25 (N.T. 2/17/23, 88).

As the year progressed, Ryan's social-emotional struggles progressively worsened. *Id*. Yet, at the IEP revision meeting held on October 12, 2021, the District proposed only a few additions to Ryan's IEP, including weekly meetings with the counselor or prevention specialist, morning check-ins, and a pass to go the counselor when needed. AR Doc. 4-8 at 790-91 (10/12/21 IEP). No other changes were made to his IEP at this time, including no changes to the goals, behavior plan, or his placement in itinerant learning support for the majority of his day. Not surprisingly, no positive response or improvement was seen in Ryan following the implementation of these revisions to the IEP.  AR Doc. 4-7 at 25 (N.T. 2/17/23, 88).

Ryan's anxiety levels about school were at such a level that despite his previous struggles with virtual learning, the Parents felt the best course of action was to request that Ryan attend the Downingtown Cyber Academy ("DCA") as he could not continue at Marsh Creek given his ongoing worsening social-emotional and behavioral issues. *Id*. at 25 (N.T. 2/17/23, 88-89). In response to the Parents' request, the District would only agree to part-time attendance at DCA. *Id*. The

33

Parents also requested at the November 2021 IEP meeting consideration of other programs oper-ated by the Chester County Intermediate Unit, including the Gateway Program and TEACH. *Id*. at 25 (N.T. 2/17/23, 89). However, the District immediately dismissed those options. *Id*. Instead, the District continued to pursue the placement contained in the IEP, which was an itinerant level of learning support. As a result, the Family made the difficult decision to remove Ryan from his in-appropriate public school program and place him at The Concept School.

* * *

Because Ryan's IEP was inappropriate and he failed to make meaningful social and emo-tional progress, the School District denied Ryan a FAPE. He is due full days of compensatory education from October 24, 2020, through November 15, 2021, prior to moving to the Concept School.

When a school district fails to provide FAPE, it is well-settled that compensatory education is an appropriate and available equitable remedy for the student. *Jana K.*, *supra*, 39 F. Supp. 3d at 608. Compensatory education begins to accrue at the point in time in which the school district knew or should have known that the IEP was inappropriate. *M.C. v. Central Regional School Dist.*, 81 F.3d 389, 397 (3d Cir. 1996). "[I]t is the responsibility of the child's teachers, therapists, and administrators—and the multidisciplinary team that annually evaluates the student's progress—to ascertain the child's educational needs, respond to the deficiencies, and place him or her accord-ingly." *Id*.

"Obviously, the case [for compensatory education] . . . will be stronger if the district actu-ally knew of the educational deficiency or the parents had complained . . . ." *D.K. v. Abington School District*, 696 F.3d 233, 249 (3d Cir. 2012). A court should "fashion . . . [the] compensatory education award to put [the student] . . . in the educational position []he would have occupied but

34

for the District's violations [of IDEA.]" *Jana K.*, 39 F. Supp. 3d at 608. The IDEA gives courts "broad discretion" to award compensatory education as an "equitable remedy" for students who have been denied a FAPE. *Reid v. District of Columbia*, 401 F.3d 516, 522-23 (D.C. Cir. 2005). The compensatory education award must "provide the educational benefits that likely would have accrued from special education services" that the school district "should have supplied in the first place." *Id.* at 524.

"[I]n a case such as this, where the school district's failure to provide specialized services permeated the student's education and resulted in a progressive and widespread decline in [his] academic and emotional well-being, . . . 'parsing out the exact amount of hours [a student] was not benefitted by [a] FAPE . . . would place an arduous and near impossible task upon the administrative bodies.'" *Jana K*, 39 F. Supp. 3d at 609-10 (*quoting Keystone Cent. School Dist. v. E.E.*, 438 F. Supp. 2d 519, 525-26 (M.D. Pa. 2006)). In such cases, an award of full days compensatory education may be appropriate "when the overall effect of a district's failure to provide a FAPE resulted in a pervasive loss of education benefit to the student." *Id.* at 610 (*citing Tyler W. v. Upper Perkiomen Sch. Dist.*, 963 F. Supp. 2d 427, 438-39 (E.D. Pa. 2013) (finding that when student makes little to no academic progress, it indicates that the district's failure to address his needs pervaded his entire school day and warrants the award of full days compensatory education); *Penn Trafford Sch. Dist. v. C.F.*, 2006 WL 840334 at *9 (W.D. Pa. Mar. 28, 2006) (awarding full days compensatory education for period of deprivation because IEP "failed to confer any meaningful educational benefit")).

Like *D.K.*, *supra*, the District actually knew of the educational deficiency and the parents repeatedly complained about Ryan's suicidal ideation and serious social, emotional, and behavioral needs throughout his fifth and sixth grade years. As the court explained in *Jana K.*, *supra*, the

35

school district's failure to provide specialized services permeated Ryan's education and resulted in a progressive and widespread decline in his emotional well-being. The District's failure to provide a FAPE resulted in a pervasive loss of educational benefits. Therefore, the Plaintiffs respectfully request the Court award Ryan full days of compensatory education.

### C.    The Family is entitled to tuition reimbursement at the Concept School.

The Supreme Court established that when a school district's IEP is inappropriate, and when the parents obtain and pay for an appropriate private school program, along with other equitable considerations, the school district must fund it. *School Comm. of Burlington v. Dept. of Educ. of Massachusetts*, 471 U.S. 359, 370-71, 105 S. Ct. 1996, 2002-03 (1985); *Florence County School Dist. v. Carter*, 510 U.S. 7, 14, 114 S. Ct. 361, 365-66 (1993); 34 C.F.R. § 300.148(c). Therefore, parents who disagree with their child's program and placement at a school district may enroll their child in an appropriate out-of-district placement and obtain tuition reimbursement where a court determines that the school district has not offered a FAPE to the child. *Shore*, *supra*, 381 F.3d at 198-99.

Under the test for tuition reimbursement in *Burlington/Carter*, a court first determines whether the school district followed IDEA's procedures and offered the student a FAPE through an appropriate, written IEP. *Burlington*, 471 U.S. at 369-70, 105 S. Ct. at 2002. Next, the court must determine whether the private school was "proper under the Act." *Carter*, 510 U.S. at 11, 114 S. Ct. at 364. The private school need not be the least restrictive environment, and, critically, it is not held to the same FAPE standard as the school district. *Id*. at 13-14; *see also Warren G. ex rel. Tom G. v. Cumberland County School Dist.*, 190 F.3d 80, 83-84 (3d Cir. 1999). Once a court determines a placement is appropriate, the court may only reduce the tuition reimbursement if the court finds that an equitable reduction is necessary after examining whether the parents (1)

36

informed the school district of their intent to remove the student, (2) made their child unavailable for a reevaluation, or (3) otherwise acted unreasonably. 34 C.F.R. § 300.148(d).

Tuition reimbursement is also an available remedy under Section 504. *Molly L. v. Lower Merion School Dist.*, 194 F.Supp.2d 422, 429 n.7 (E.D. Pa. 2002) ("Tuition reimbursement has been awarded in cases arising under both the Rehabilitation Act and IDEA."). "The substantive requirements of Section 504 in the education context are largely, but not entirely, equivalent to the requirements under the IDEA." *James S. v. School Dist. of Phila.*, 559 F. Supp. 2d 600, 620 (E.D. Pa. 2008). Indeed, a school may violate Section 504 independent of any violations of IDEA. *Lauren G. v. West Chester Area School Dist.*, 906 F. Supp. 2d 375 (E.D. Pa. 2012). To establish a violation of Section 504, a plaintiff must prove that: (1) he is "disabled" as defined by the Act; (2) he is "otherwise qualified" to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at the school. *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 253 (3d Cir. 1999).

Finally, where the District violates Section 504, it also violates the ADA. *Jeremy H. v. Mount Lebanon School Dist.*, 95 F.3d 272, 279 (3d Cir. 1996). The Third Circuit has held that the ADA "extends the nondiscrimination rule of [Section 504] to services provided by any 'public entity' (without regard to whether the entity is a recipient of federal funds)." *Id*.

Here, the Family is entitled to tuition reimbursement at Ryan's private school (the Concept School). This Court should reverse the Hearing Panel and order tuition reimbursement.

        **1.**        **The School District failed to offer Ryan a FAPE through its November 2021 and August 2022 IEPs.[3]**

---

[3] To avoid repetition, the Family incorporates by reference the argument contained in Section VI(B)(1), *supra*, which explains in depth how the School District denied Ryan a FAPE.

On October 12, 2021, as Ryan's social and emotional needs were deteriorating, the parties met to revise the IEP. The District proposed only a few additions to Ryan's IEP, including weekly meetings with the counselor or prevention specialist, morning check-ins, and a pass to go the counselor when needed. AR Doc. 4-8 at 790-91 (10/12/21 IEP).  No other changes were made to his IEP at this time, including no changes to the goals, behavior plan, or his placement in itinerant learning support for the majority of his day. Not surprisingly, no positive response or improvement was seen in Ryan following the implementation of these revisions to the IEP.  AR Doc. 4-7 at 25 (N.T. 2/17/23, 88).

At the November 2021 IEP meeting, the parents requested a new placement at the Chester County Intermediate Unit, such as the Gateway Program or TEACH. AR Doc. 4-7 at 25 (N.T. 2/17/23, 89). However, the District immediately dismissed those options. *Id*. Instead, the District continued to recommend placement contained in the IEP, which was an itinerant level of learning support.

The School District's August 2022 IEP failed to meaningfully change beyond the District's November 2021 IEP. For example, the IEP failed to meaningfully consider the Neuropsychological Evaluation by Dr. Lazar and Dr. DeVries beyond a brief mention that the assessment occurred, and the diagnoses given.  AR Doc. 4-8 at 985 (8/2022 IEP). Critically, the IEP includes the same social-emotional and behavioral goals that have been in Ryan's IEPs since the middle of his fourth-grade year, using old baseline data from November of 2021, failing to consider where he was functioning at TCS. AR Doc. 4-8 at 1001-03 (8/2022 IEP). It repeated the same Positive Behavior Support Plan. *Id*. at 1009-11. The School District proposed to place him in a general education classroom for 75% of the day, where the average class size is 25 students and in Downingtown Middle School, which has 1,100 students. AR Doc. 4-6 at 45 (N.T. 4/3/23, 546); AR Doc. 4-8 at 1021 (8/2022

38

IEP).[4]

> **2. The equities favor a tuition award, as the Family fully cooperated in the IEP process and only rejected the IEPs because Ryan was exhibiting serious emotional needs and the School District was repeating its ineffective supports and services from year to year.**

The Hearing Officer's conclusion that equitable considerations do not support a tuition award is erroneous and a product of form over substance. AR Doc. 4-3 at 31-33 (Decision, 30-32). The Family repeatedly voiced their concerns, participated in the IEP process, and gave the School District ample opportunity to amend Ryan's IEP to provide him with appropriate services to support his social and emotional needs. The School District repeatedly failed to do so. Equitable considerations favor a tuition award.

Once a court determines a private placement selected by parents is appropriate, the court may only reduce the tuition reimbursement if the court finds that an equitable reduction is necessary after examining (1) whether the parents informed the school district of their intent to remove the student, (2) whether the parents made their child unavailable for a reevaluation, or (3) whether the parents otherwise acted unreasonably. 34 C.F.R. § 300.148(d).

In an equities analysis, IDEA and the Third Circuit require only that parents participate in the IEP process, provide notice of their intent to seek private school tuition, and act reasonably. *School District of Philadelphia v. Kirsch*, 722 F. App'x 215, 223-24 (3d Cir. 2018). In *Kirsh*, the Third Circuit held that parents acted reasonably even though the "[p]arents entered into an irrevocable tuition contract with" the private school "while they were trying to work with the [s]chool [d]istrict to obtain IEPs and appropriate placements for [the student.]" 722 F. App'x at 219. In fact,

---

[4] The Hearing Officer found that Ryan made progress at The Concept School and that The Concept School was an appropriate placement for Ryan. AR Doc. at 19, 30-31 (Decision, 18, 29-30). The School District did not appeal that finding. Should the School District challenge this finding in their Brief in Opposition to the Family's Motion for Judgment on the Administrative Record, the Family reserves the right to respond to that argument in its Reply Brief.

the parents in *Kirsh* not only signed the tuition contract, they actually "were . . . working to create [the] private school" that the student eventually attended. *Id*. The Third Circuit reiterated Congress' requirement in IDEA that a parent's conduct must be "unreasonable" to reduce or deny a tuition award. *Id*. at 223 (*quoting C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 71 (3d Cir. 2010); 20 U.S.C. § 1412(a)(10)(C)(iii)(III) (quotation marks omitted)).

In *C.H. v. Cape Henlopen Sch. Dist.*, this Court reduced the tuition award because the "parents . . . refused to give the school district permission to evaluate [the student], which was necessary to develop the IEP." 606 F.3d at 63-64. The *C.H. v. Cape Henlopen Sch. Dist.* court reduced the tuition award because the parents were decidedly uncooperative and unilaterally delayed the IEP meeting until after the school year began. *Id*.; *see also Upper Freehold Regional Board of Education v. T.W.*, 496 F. App'x 238 (3d Cir. 2012) ("*Cape Henlopen* presented a very unique situation, and the holding in that case simply cannot be applied once the parties have been working toward formulating an IEP, and then reach an impasse.").

It is uncontradicted that the Family repeatedly voiced their concerns with Ryan's program and placement throughout the fifth and sixth grades. In early November 2021, the Family requested a placement through the Downingtown Cyber Academy ("DCA"). And then at the IEP meeting on November 10, 2021, they requested therapeutic placements through the CCIU. Nevertheless, Mr. Gerl held that the Family "failed to provide the required ten business days' notice of the removal of the student from the school and that they were rejecting the placement proposed by the school district and intending to enroll the student in a private school at public expense." AR Doc. 4-3 at 31 (Decision) (*citing* 34 C.F.R. § 300.148(d)(1)(ii)).

The Family provided formal written notice of their intent to move Ryan to the Concept School on November 14, 2021. AR Doc. 4-8 at 892 (11/14/21 Email from Family to Dist.). The

40

fact that the Family did not provide a form letter explicitly referencing 34 C.F.R. § 300.148(d)(1)(ii) or provide a few more days of notice is the ultimate "form over substance" argument. Their child was suicidal. They had given the School District two school years to offer increased supports and services, but as outlined above, the District never made substantive changes to Ryan's IEP sufficient to support his social and emotional needs. Furthermore, when the School District received the Family's written notice of intent to remove Ryan from the District's schools, the District immediately (the next day) sent the Family a form letter stating that the District would not agree to fund the placement. *Id*. at 895 (11/15/21 ltr. from Dist. to Family).

In any event, it is uncontradicted that the Family certainly provided 10-days notice in accordance with 34 C.F.R. § 300.148(d)(1)(ii) before re-enrolling Ryan at The Concept School for the 2022-2023 school year.

The Hearing Officer goes to great lengths to claim that the Family "predetermined" that they were going to use a private school over the School District, and in support thereof cites to the Family's refusal to agree to a psychiatric evaluation the School District offered. AR Doc. 4-3 at 32 (Decision). But that finding is contradicted by the School District's records. The Family followed up with the School District on February 11, 2022, asking for the psychiatric evaluation. AR Doc. 4-8 at 898-99 (Emails between Family and District). Sallie Seidel (the District's Special Education Director) responded that Ryan would be placed on a waiting list and would be evaluated when there was an opening. *Id*. No opening ever occurred.

Furthermore, when the Family requested funding for TCS, Ms. Seidel sent the Family a letter stating the District would hold an IEP meeting and/or conduct an evaluation. AR Doc. 4-8 at 895. When the Family emailed asking why an evaluation would be needed now that Ryan is out of District, Ms. Seidel responded that it was simply a form letter by the District sent to all parents

41

who request private school funding. *Id*. at 897 (Email from Seidel to Family).

The record demonstrates that the Family always acted reasonably and cooperated in the IEP process up until they reached a breaking point and needed to move Ryan out of District to support his severe emotional needs.

## VII.   CONCLUSION

The Plaintiffs respectfully request that this Court: reverse the Decision of Hearing Officer Gerl and award (1) compensatory education from October 24, 2020 to November 15, 2021; (2) reimbursement for tuition, costs, and transportation for the 2021-22 school year (starting on November 15, 2021) and the 2022-23 school year; (3) attorney's fees and costs; and (4) any other such other relief as this Court deems just and proper.

Respectfully submitted,

/s/ *D. Daniel Woody*
D. Daniel Woody, Esquire
ID No. 309121

/s/ *Michael J. Connolly*
Michael J. Connolly, Esquire
ID No. 82065

/s/ *Dennis C. McAndrews*
Dennis C. McAndrews, Esquire
ID No. 28012

McANDREWS, MEHALICK, CONNOLLY,
HULSE & RYAN, P.C.
30 Cassatt Avenue
Berwyn, PA 19312
(610) 648-9300 (phone)
(610) 648-0433 (fax)
Attorneys for Plaintiffs

42