# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RYAN S., by and through his parents, | : | Civil Action |
| George S. and Christine S., and | : | |
| GEORGE S. and CHRISTINE S., | : | No. 2:23-cv-03270-JMY |
| individually, | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| DOWNINGTOWN AREA | : | |
| SCHOOL DISTRICT | : | |
| Defendant. | : | Hon. John M. Younge |

**DEFENDANT, DOWNINGTOWN AREA SCHOOL DISTRICT'S
BRIEF IN SUPPORT OF COMBINED MOTION
FOR JUDGMENT ON THE ADMINISTRATIVE RECORD
AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGMENT
ON THE ADMINISTRATIVE RECORD**

The hearing officer properly ruled in favor of the School District. The School District provided a free appropriate public education to Student, the hearing officer did not make any reversible errors of fact or of law, the hearing officer's decision is to be affirmed, and judgment is to be entered in favor of the School District and against Plaintiffs.

## I. STANDARD OF REVIEW

An IDEA appeal in the district court is subject to "modified *de novo*" review. *S.H. v. State-Operated Sch. Dist. of the City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003). The district court "may reach an independent decision, except that

it must accord the decision of the [hearing officer] 'due weight' in its consideration." *Carlisle Area Sch. Dist. v. Scott P.,* 62 F.3d 520, 524 (3d Cir. 1995), *cert. denied*, 517 U.S. 1135 (1996). "Due weight" means "[f]actual findings from the administrative proceedings are to be considered *prima facie* correct." *S.H.*, 336 F.3d at 270. If the court departs from the administrative findings, it must detail why. *Id*.; *Scott P.,* 62 F.3d at 527.

The burden of proof is on the party bringing the administrative complaint, here the Plaintiffs, a burden that continues on appeal. *Schaffer v. Weast*, 546 U.S. 49 (2005); *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384 (3d Cir. 2006).

## II.  ARGUMENT

Although it "open[ed] the door of public education to [disabled] children on appropriate terms," the IDEA did not "guarantee any particular level of education once inside." *Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 192 (1982). "[T]he IDEA cannot and does not promise any particular educational outcome. No law could do that – for any child." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 580 U.S. 386, 398 (2017) (citations, quotations, and edits omitted).

A free appropriate public education ("FAPE"), 20 U.S.C. § 1401(9), must be offered through an IEP that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances," *Endrew F.*, 580 U.S. at

403.  *See also Rowley*, 458 U.S. at 207; *Polk v. Central Susquehanna I.U. 16*, 853 F.2d 171, 185 (3d Cir. 1988), *cert. denied*, 488 U.S. 1030 (1989).  There is no difference between *Endrew F*. and the prevailing Third Circuit standard.  *K.D. ex rel. Dunn v. Downingtown Area Sch. Dist*., 904 F.3d 248 (3d Cir. 2018).

A "reasonably calculated" IEP "requires a prospective judgment by school officials."  *Endrew F., 580 U.S. at 399*.  "Reasonably calculated" is determined by the knowledge available at the time the IEP is offered and not through hindsight evidence.  *D.S. v. Bayonne Board of Education*, 602 F.3d 553, 564-65 (3d Cir. 2010); *Scott P.,* 62 F.3d 533-34; *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 762 (3d Cir. 1995); *Furhmann v. East Hanover Board of Education*, 993 F.2d 1031, 1040 (3d Cir. 1993).  In this prospective calculation, "progress" is not the after-the-fact determinant for any prior IEP's appropriateness.  A child's "progress" is part of the "the child's circumstances" informing the IEP's development.  Proper "prospective judgment" involves a "fact-intensive exercise . . . informed not only by the expertise of school officials, but also by the input of the child's parents. . .*"* *Endrew F*., 580 U.S. at 399.  Each IEP is developed "only after careful consideration of the child's present levels of achievement, disability, and potential for growth."  *Id.  See also* 20 U.S.C. § 1414(d)(4)(A) (prescribing review and revision process).  *Endrew F*. reiterates that "[t]he adequacy of a given IEP turns

on the unique circumstances of the child for whom it was created." 580 U.S. at 404.

Given the question of "the child's circumstances" and "prospective judgment," "[t]he issue of whether an IEP is appropriate is a question of fact. . . ." *D.S.*, 602 F.3d at 564. *See also, Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004). When resolving this "difficult problem," *Endrew F.*, 580 U.S. at 399, "[c]ourts are not to substitute their own notions of sound educational policy for those of school authorities. . . ," *Rowley*, 458 U.S. at 206, a principle reaffirmed in *Endrew F.*, 580 U.S. at 404. The court, instead, "must accord significant deference to the choices made by school officials. . . ." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 277 (3d Cir. 2012). *See also T.M. ex rel. T.M. v. Quakertown Cmty. Sch. Dist.*, 251 F. Supp. 3d 792, 799 (E.D. Pa. 2017). *Endrew F.* emphatically reinforced deference, *see* 580 U.S. at 404 (quoting *Rowley*, 458 U.S. at 206), and rejected the notion "that the IDEA effectively empowers judges to elaborate a federal common law of public education," *Endrew F.*, 580 U.S. at 398.

1. **Plaintiffs' first issue (*see* ECF 17-1 at 5 of 45): Plaintiffs received a fair and impartial hearing and decision**.

The hearing officer was deliberate with both sides, equally cautious about excess lawyering. "I will ask you to keep your evidence to just those issues. Again, we have set aside two days for this hearing which is a lot, so I hope we can

finish at that time." Admin. Rec. N.T. at 10:2-7 (Hearing Officer). The hearing officer limited opening statements to five minutes. Admin. Rec. N.T. at 15:22-24. Plaintiffs' counsel raised no objection. Admin. Rec. N.T. at 16:15. Caution proved, unsurprisingly, necessary: in the end, Plaintiffs took 10 minutes for their opening statements, Admin. Rec. N.T. at 30:3-4; school district counsel took slightly over 10 minutes, Admin. Rec. N.T. at 46:15-21 (hearing officer, telling counsel to wrap it up).

Hearing Officer qualification. Plaintiffs first make reference to credentials required of an IDEA hearing officer, ECF 17-1 at 24 of 45, seeming to suggest the Hearing Officer James Gerl, who presided over the hearing, is not qualified. They do not offer support for any view that the hearing officer is not qualified.

Expert testimony. The hearing officer's conduct of the hearing was fair and impartial, and his findings and conclusions were regularly made. Everything he did was in accord with the Office for Dispute Resolution's ("ODR") Uniform Prehearing Directions (Feb. 2020 Update) sent November 11, 2022 at 3:18 PM by the hearing officer to counsel for both parties. *See, e.g., id.* Section 4: "Reports as Evidence" and Section 5: "Hearing Duration and Witness Time Allotments" under caption "The Hearing"). *See also* "Uniform Prehearing Directions" (May 2023 Update) (direction nos. 4 and 5 under caption "The Hearing") (available at https://odr-pa.org/due-process/procedures/ on the right-side link to "Prehearing

Directions") (last accessed March 25, 2024).  The generally applicable rules developed by the ODR are well-known in the field, as is the ability to obtain exceptions to the general rule.

Plaintiffs allege that the hearing officer "diverted" from "standard practice" by limiting Plaintiffs' direct examination of their expert witness.  ECF 17-1 at 24 of 45.  The "standard practice" is contained in the Uniform PreHearing Directions addressed above.  Notably, the expert's report, Admin. Rec. J-43, was admitted into the record at the outset of the hearing, before any testimony.  Admin. Rec. N.T. at 13:14-15.  As the hearing officer stated, "[t]hey [the Joint Exhibits] are now in evidence for anything they might be cited for.  Unless they are ambiguous or unclear or need to be explained in some way, they speak to themselves and I prefer not to have witnesses read them to me."  Admin. Rec. N.T. at 13: 15-22.

Plaintiffs' counsel knew the rule for expert testimony when the expert's report was part of the record.  Admin. Rec. N.T. at 384:1-7 (Connolly).  The hearing officer confirmed counsel's understanding and further explained that, for good cause, counsel could have more time.  Admin. Rec. N.T. at 384:9-21.  Counsel did not object.  Admin. Rec. N.T. at 384:22 (Connolly).  Counsel proceeded to ask about the expert's credentials, what certain sections of the report addressed, and a few other matters, such as the private school.  The approach is a strategy choice, no less than if counsel submitted the expert's resume in lieu of

6

testimony or a stipulation about credentials or simply passed off the expert and reserved all time for re-direct.

Although the hearing officer told counsel he did not get to re-direct the expert, Admin. Rec. N.T. at 419:24-25, the hearing officer allowed re-direct and counsel exhausted his questions, Admin. Rec. N.T. at 424:23-24 and at 426:8-9 (Connolly). The expert witness was excused, Admin. Rec. N.T. at 432:9-10, with no objection raised throughout. Parents then rested their case. Admin. Rec. N.T. at 429:19-20 (Connolly).

District witnesses. Plaintiffs argue that the hearing officer permitted the School District a full 60 minutes of direct examination for its witnesses. ECF 17-1 at 25 of 45. Plaintiffs' citations to the record here seem beside the point, showing the hearing officer advising respective counsel of their time remaining out of their allotted 60 minutes, and letting counsel gauge how much time to reserve for possible re-direction.[1] Plaintiffs' Brief shows the conduct and rule being the same on both sides. The 60 minutes rule for examination of non-expert witnesses is the

---

[1]   Plaintiffs mischaracterize the rule as applying to direct examination. The 60 minute rule applies to all questioning. "Uniform Prehearing Directions" (both Feb. 2020 and May 2023 Update) (direction no. 5 under caption "The Hearing").

standard practice as noted above.[2]  Both Plaintiffs and the School District were allowed 60 minutes for examination of witnesses.

Plaintiffs try to peg District witnesses as experts, but they are undoubtedly fact witnesses: "What did you do?" and "Why did you do it?" effectively summarize testimony in these cases.  *See inter alia*, Admin. Rec. N.T. at 438-39 (addressing school team assignment); at 543:12 ("what does that mean?"); at 602-03 (addressing IEP Team meeting discussion); *etc*.  In the end, it is the school officials who need to provide a "cogent explanation" of their decisions.  *Endrew F.*, 580 U.S. at 404.

Parents' testimony.  Plaintiffs argue that the Plaintiff-mother was limited to 60 minutes of testimony.  ECF 17-1 at 25 of 45.  This is consistent with the Uniform Prehearing Directions.  Plaintiffs used up their allotted time on direct examination, notwithstanding the hearing officer's periodic reminder of time remaining.  *See* ECF 17-1 at 25 of 45.  Yet as Plaintiffs admit, ECF 17-1 at 25 of 45, counsel requested and the hearing officer allowed a limited re-direct examination of the Plaintiff-mother, Admin. Rec. N.T. at 137:18-23.

---

[2]  Plaintiffs cite Admin. Rec. N.T. at 433-34 as "warning School District counsel that she had 30 minutes remaining. . . ." ECF 17-1 at 25 of 45.  That is not quite right.  The discussion of how much time remains occurred because the witness, whose testimony started at the first session, was interrupted to accommodate parents' expert, with no one having recorded how much examination time was left.  All agreed it was 30 minutes.

Burden of proof. Plaintiffs argue that they had the burden of proof so the time allowed to them was "unfair and in contravention of appropriate, standard legal practice. See 20 U.S.C. § 1415(f)(3)(A)(ii), (iii)." ECF 17-1 at 26 of 45. The citation is to language relating to hearing officer qualifications and "ability to conduct hearings in accordance with appropriate, standard legal practice" but Plaintiffs offer no support for what is "standard legal practice" in contrast to the published Uniform Prehearing Directions. And so the question is simply whether application of the general rules and any exception was an abuse of discretion? It was not. *See G.L. ex rel. S.H. v. Saucon Valley Sch. Dist.*, 267 F. Supp. 3d 586, 609 (E.D. Pa. 2017) (applying discretion) (citing *K.C. ex rel. her Parents v. Nazareth Area Sch. Dist.*, 806 F. Supp. 2d 806, 815–18 (E.D. Pa. 2011); *David G. v. Council Rock Sch. Dist.*, Civ.A. 06-1523, 2012 WL 1231812, \*2 (E.D. Pa. Apr. 12, 2012)).

Alleged bias against Plaintiffs. Plaintiffs' Brief mischaracterizes various matters that, they say, demonstrate bias. Plaintiffs write, "In his Decision, he criticized the Family's expert for not observing [Student] in the School District's schools. AR Doc. 4-3 at 16 (Decision). However, the parents retained the psychologist after [Student] enrolled at TCS." ECF 17-1 at 26 of 45. Plaintiffs materially misstate Finding of Fact number 57, which does not refer to observing Student in the School District classroom. Rather, the noted fact is that the expert

9

"relied solely upon information provided by the parents and their lawyer." H.O. Dec. at 15 of 36 FF 57. The finding is correct, as the expert testified she did not observe Student at the School District, Admin. Rec. N.T. at 396:18-20 (Lazar), or obtain information from the School District about the School District's programming for Student, *see, inter alia*, Admin. Rec. N.T. at 398:20-25, at 399:9-19, at 405:15-22, and at 418:13-16 (Lazar). The expert considered only records that were provided by parents. Admin. Rec. N.T. at 406:8-15 (Lazar). Thereafter, the hearing officer notes things the expert did not do that would have balanced her information, including observing the classroom that Student "had attended" or "would have attended in the school district." *See Zachary J. v. Colonial Sch. Dist.*, Civ.A. 19-652, 2022 WL 580309, 2022 U.S. Dist. LEXIS 33145, at *40 (E.D. Pa. Feb. 24, 2022) (reviewing credibility), *aff'd* C.A. 22-1509, 2024 WL 366180, 2024 U.S. App. LEXIS 2187 (3d Cir. Jan. 31, 2024); *Gwendolynne, S. v. W. Chester Area Sch. Dist.*, Civ.A. 19-3844-JMY, 2021 WL 949483, 2021 U.S. Dist. LEXIS 46562, at *24-29 (E.D. Pa. Mar. 12, 2021) (addressing expert credibility), *aff'd, G.S. v. W. Chester Area Sch. Dist.*, C.A. 21-1680, 2022 WL 2233909, 2022 U.S. App. LEXIS 17151, at *6-8 (3d Cir. June 22, 2022) (addressing credibility).

Plaintiffs assert that the hearing officer "downplayed [Student's] repeated suicidal ideations, referring to his desire to kill himself as 'negative self-talk.' " ECF 17-1 at 26 of 45. In an age of euphemisms, negative self-talk is hardly a

phrasing of disregard but a kinder phrasing when discussing a child's suicidal utterings with his parents. Such softer phrasing is used commonly and in this very hearing. *See, e.g.,* Admin. Rec. N.T. at 82:16 (mother, discussing "negative experience" with guidance counselor), at 113:18 (asking mother about Student's "negative side effects" of medications), and at 199:18 (Falkner, "negative self-talk"). Student is also described as making "statements about hating himself," Admin. Rec. at 68:9-10 (Connolly), making the hearing officer's phrasing more encompassing of Student's struggles. Counsel softens it too. *See* ECF 17-1 at 34 of 45 (referring to "behavioral difficulties, those negative behaviors"). The phrasing does not demonstrate bias.

Plaintiffs say bias is also found in an "implication" that the hearing officer "blame the parents" for Student's talk of self-harm. ECF 17-1 at 26 of 45. Plaintiffs then bullet-point extracts from the Hearing Officer Decision, ECF 17-1 at 26-27 of 45, but do not contest the factual accuracy of the hearing officer's findings. Instead, Plaintiffs imply the facts mean bias in the form of "blame the parents" because the facts show limited in-school concerns compared to in-home. The offered selections, or indeed a holistic reading of the Decision and underling evidence give no ground to infer bias. Implication is not proof of error.

Broad-based citations to the record. Plaintiffs challenge the hearing officer's broad record citations. ECF 17-1 at 27-28 at 45. It is indeed frustrating, even

11

when done by our colleagues, *see Anthony B. v. Colonial Sch. Dist.*, C.A. 22-1640 (Doc. 17 Brief of Appellants at 9).[3] If that is the proper legal standard, then clearly the hearing officer meets expectations. But, while frustrating, it is consistent with all the Pennsylvania hearing officers' practice.[4] But Plaintiffs have not actually demonstrated an error underlying the practice. *See R.F. ex rel. R.F. v. Southern Lehigh Sch. Dist.*, Civ.A. 18-1756, 2019 WL 3714484, \*16 (E.D. Pa. Aug. 7, 2019) (noting similar argument without "identifying specific errors").

As to the citation for progress with self-regulation and social skills, the IEP's Present Levels section addresses past and current performance levels on various skills. In this case, Admin. Rec. J-14 at 12-14 of 61, does indeed address Student's performance with social communication, social skills, and self-regulation. *See also* Admin. Rec. J-15 at 11-12 of 30 (addressing inferential thinking and perspectives). *See also* H.O. Dec. at 8 of 36 FF 27 (noting progress with behaviors and coping skills, citing Admin. Rec. N.T. at 182).[5]

Plaintiffs likewise take issue with the hearing officer's citations for Student's progress during the 2021-22 school year. ECF 17-1 at 28 of 45. Plaintiffs, in turn, make a broad, non-specific challenge to all IEP goals. Breaking

---

[3] Citing to, among others, Appx. 225-26 (totaling eight full pages of testimony) and Appx. 573-643 (70-pages of private school documentation).

[4] Hearing officer decisions are published on the ODR website and one can see the practice in action.

[5] Referring to testimony of Ms. Falkner, starting at line 15.

down the hearing officer's citations, the Present Levels section of the January 5, 2021 IEP (with subsequent revisions), Admin. Rec. J-31 at 12 through 25 of 31, discusses Student's performance levels generally that year. Specifics matters, such as inferential thinking and perspective taking, Admin. Rec. J-31 at 19-20 of 31, or social/emotional learning, is at Admin. Rec. J-31 at 20-22 of 31. The August 22, 2022 IEP, Admin. Rec. J-45 at 7-8 of 59, contains Present Levels for the limited time Student was in the School District in Fall 2021 prior to Plaintiffs' decision to unilaterally place Student.[6] The Communications Chart is a 17-page chart of weekly communications throughout the 2021-22 school year offering short teacher narratives about Student's performance. Admin. Rec. J-39.[7] It is a weekly, short narrative from each teacher about Student's performance. It reflects his performance generally and, in the absence of a specific challenge, is to be treated like an *et seq*. citation by the hearing officer. The IEP progress reports, Admin. Rec. J-41, cited by the hearing officer is entirely about progress.

The hearing officer's broad assertion of progress on IEP goals is supported; what specifically Plaintiffs challenge is unknown. Ultimately, although Plaintiffs assert that the hearing officer's conclusion about progress is "belied by the records," Plaintiffs do not back up the assertion.

---

[6]   Including Student's first marking period report card grades referenced by the hearing officer. H.O. Dec. at 15 of 36 FF 53.

[7]   "This is a communication log that I created and shared with his teachers as well as parents." Admin. Rec. N.T. at 263:22-24 (Hill).

Knowledge of the Columbia – Suicide  Severity Rating Scale.  Plaintiffs claim the hearing officer failed to cite the record to show parents knew the school administered this Scale to Student.  ECF 17-1 at 26-27 of 45.  They do not explain how such alleged error is material.  In any event, Plaintiffs cite Admin. Rec. N.T. at 63-64.  There, in response to a leading question,[8] Plaintiff-mother stated a belief (Admin. Rec. N.T. at 64:5, "As best I can recall, yes.") of not seeing the Columbia Suicide Rating Scale, Admin. Rec. J-13, until preparing for the administrative hearing, Admin. Rec. N.T. at 63:24—64:5 (mother); *see also* Admin. Rec. N.T. at 64:9-11) (mother), although Student told Plaintiff-mother about it that day, Admin. Rec. N.T. at 64:5-7 (mother).  The hearing officer cited, among others, Admin. Rec. J-14, where on page 15 of 61 the revision statement discusses administration of a first and a later suicide risk assessment.  *See also* Admin. Rec. J-14 at 48-52 of 61 (Prior Written Notice); Admin. Rec.  N.T. at 169:7-15 (Falkner, discussing December 11, 2020 IEP Team meeting to revise the IEP in light of Student's suicidal statements).  In addition to the Revision IEP, parents' knowledge about the Scale is embedded in their knowledge—and complaints about implementation —of six weekly meetings between Student and the prevention specialist.

Conclusion about Plaintiffs' first issue.  Plaintiffs received a fair and impartial hearing.  They show no material, reversible error, or compounding errors

---

[8]    "So the first time you saw it was when it was – as part of the due process hearing?" Admin. Rec. N.T. at 64:2-4.

yielding a reversible result, in the hearing officer's decision or his conduct of the hearing.

> 2. **Plaintiffs' second issue (ECF 17-1 at 5 of 45): the School District provided a FAPE from October 24, 2020 through November 15, 2021**.

Plaintiffs offer two basic arguments. One is that Student failed to make progress with social and emotional needs under what they misleadingly characterize as the so-called "progress standard." ECF 17-1 at 30 of 45. *See also* ECF 17-1 at 29 of 45 ("[Student] failed to progress with respect to his social and emotional needs."). The other is that the School District did not respond appropriately to Student's suicidal ideation. ECF 17-1 at 10 and 29 of 45. *See also* ECF 17-1 at 5 of 45 ("repeated [Student's] ineffective specially designed instruction, related services and IEP goals").

The "progress standard" does not apply. *Endrew F.* rejects liability based on retrospective assessment of progress. The IDEA does not guarantee an outcome: "No law could." *Endrew F.*, 580 U.S. at 386. Given that Plaintiffs cite to *K.D. ex rel. Dunn*, *supra.*, *see* ECF 17-1 at 30 of 45, they know that "the progress standard" is not applicable and that *Endrew F.* did not "expand" on the Third Circuit's standard; rather, *Endrew F.* "mirrors our longstanding formulation: the educational program must be reasonably calculated to enable the child to receive

meaningful educational benefits in light of the student's intellectual potential and individual abilities." *K.D. ex rel. Dunn*, 904 F.3d at 254.

Plaintiffs explicitly urge reversal based on an erroneous offer of law: "[The] school district's failure to provide specialized services permeated [Student's] education and <u>resulted</u> in a progressive and widespread decline in his emotional well-being. The District's failure to provide a FAPE <u>resulted</u> in a pervasive loss of educational benefits." ECF 17-1 at 39 of 45 (emphasis supplied). A results-based outcome standard just is not the law. Instead, the standard remains whether the IEP was reasonably calculated at the time it was offered.

<u>Appropriate response to Student's presenting needs</u>. Sandy Falkner was Student's special education teacher from 1st through 5th grades. Admin. Rec. N.T. at 151:6-12 (Falkner). Fifth grade started all-virtual, Admin. Rec. N.T. at 155:23-24 (Falkner), and by late October 2020 Student was attending in-person four days per week, Admin. Rec. N.T. at 157:4-13 (Falkner). Student readily transitioned to in-person instruction. Admin. Rec. N.T. at 199:8-12 (Falkner). The school resumed in-person instruction for all students in April 2021. Admin. Rec. N.T. at 158:3-8 (Falkner).

Plaintiffs contend that the December 2020 Reevaluation Report, done in response to suicidal ideation and possibly changing Student's identification to "emotional disturbance," ECF 17-1 at 10-11 of 45, did not contain enough

academic testing, ECF 17-1 at 11 of 45.  *See also* ECF 17-1 at 35 of 45.  The

Reevaluation Report documents extensive prior testing and academic performance

levels.  Plaintiffs do not explain how the academic testing, done as part of a

Reevaluation Report developed in response to Student's suicidal ideation and

appropriate identification, is inappropriate.[9]

As to Student's emotional functioning, Plaintiffs do not explain what more

needed to be done to conclude that Student exhibited signs and symptoms of

anxiety and depression, and that Student's own report demonstrated high levels of

mood symptomology that needed to be addressed.  Admin. Rec. J-15 at 21 of 30

(summary).  Nor do Plaintiffs explain a claimed error in the hearing officer not

referencing subscales rated as clinically significant.  ECF 17-1 at 11-12 of 45.

"Clinically significant" is a term of art with regard to psychological scales,

indicating according to the particular publisher's protocol a score exceeding a

certain number, and is not to be confused with some lay understating, which

Plaintiffs' Brief seems to imply.  ECF 17-1 at 11-12 of 45.

Plaintiffs also assert that the School District did not offer to conduct a

psychiatric evaluation in December 2020.  ECF 17-1 at 35 of 45.  They make no

---

[9]    The Reevaluation Report notes parents' input that Student is strong in academics, but not reading and writing.  Admin. Rec. J-15 at 3 of 30.  *See also id*. at 4 of 30 (parent input number 12, expressing concern about Student's mental health and ELA skills).

argument about it.  They just say it.  The record does not support the empty suggestion.

Plaintiffs point out that the hearing officer's decision also did not "reference" the fact that the School District did not conduct a Functional Behavioral Analysis ("FBA") at that time (but note one had been done previously).  ECF 17-1 at 12 of 45.  Plaintiffs then assert that the law requires an FBA whenever a child shows behavioral needs.  ECF 17-1 at 32 of 45.  But the IDEA's only mention of an FBA relates to discipline.  20 U.S.C. § 1415(k)(2)(F)(i); *G.L.*, 267 F. Supp. 3d at 609.  An FBA is otherwise not required in order to develop an appropriate IEP.  Pennsylvania state regulations require an FBA in order to develop a Positive Behavior Support Plan ("PBSP") (and an FBA was done previously), which in turn is required when a student exhibits the need for a "specific intervention to address behavior that interferes with learning."  22 Pa. Code § 14.133(b).  The state regulations do not require an FBA at any particular intervals, and Plaintiffs do not explain why an FBA was needed at this time.

Plaintiffs cite *C.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68 (2d Cir. 2014), where plaintiffs argued that "the Department failed to develop an appropriate functional behavioral assessment or behavioral intervention plan, <u>as required by state law</u>." *Id*. at 80 (emphasis added).  *See also id*. at 72 (discussing state regulations).  Plaintiffs also cite *Upper Darby Sch. Dist. v. K.W*., Civ.A. 22-04343,

2023 U.S. Dist. LEXIS 129803 (E.D. Pa. July 27, 2023), a case in which the school district failed to act on multiple recommendations to develop a Positive Behavior Support Plan given the aggressive "behavioral problems." *Id*. at *24. The facts in *Norristown Area Sch. Dist. v. Frank C*., Civ.A. 13-5612, 2014 U.S. Dist. LEXIS 201121 (E.D. Pa. June 18, 2014), show no dispute of the need to develop a Positive Behavior Support Plan and the school district's failure to do so. *Id*. at *21-22.

Prior to the December 11, 2020 Revision IEP, Team members discussed the addition of support provided by the prevention specialist. Admin. Rec. N.T. at 169:16 – 170:10 (Falkner). On December 11, 2020, the IEP Team convened to revise the IEP in light of Student's suicidal statements. Admin. Rec. N.T. at 169:7-15 (Falkner). The IEP Team added certain things including to have Student meet with a prevention specialist weekly for six weeks. Admin. Rec. J-14 at 15 of 61 (November 20, 2020, update) and 43 of 61 (last SDI, adding weekly meeting starting Dec. 14, 2020). The preferred prevention specialist was not able to provide the support at the time, and so Ms. Falkner and the school counselor served the support role initially. Admin. Rec. N.T. at 170:14 – 171:1 (Falkner). *See also* Admin. Rec. N.T. at 186:14-22, and at 187:2-16 (Falkner, describing reason first prevention specialist was unable to do so).

Parents first complained that Student initially met with a school counselor rather than a prevention specialist, Admin. Rec. N.T. at 70:23 – 71:6 (mother), then

complained that a different prevention specialist picked up the case, Admin. Rec. N.T. at 71:12-14 (mother). *See also* ECF 17-1 at 11, 33-34 of 45. But on cross, parents admitted that the support provided by the school counselor or emotional support teacher pre-dated the IEP Team meeting. Admin. Rec. N.T. at 129:1-19 (mother).

On January 5, 2021, the IEP Team agreed to start again with the different prevention specialist. Admin. Rec. N.T. at 75:4-7 (mother). The prevention specialist provided the support through all the required six week course of sessions. Admin. Rec. N.T. at 171:8-12 (Falkner). *See also* Admin. Rec. J-16 at 42 of 51 (adding prevention specialist starting January 15, 2021). After providing the full six week course of sessions with Student, the prevention specialist determined Student no longer needed the support. Admin. Rec. N.T. at 189:7-10 and at 191:10-13 (Falkner).

A Revision IEP dated January 25, 2021 updated the PBSP and revised a Crisis Plan. Admin. Rec. N.T. at 173:18-23 and at 175:6-8 (Falkner); Admin. Rec. J-18 at 2 (revision statement), 18 (parent concerns), 21-21 (PBSP assessment summary), 37-39 (PBSP and Crisis Plan) of 50. The supports were added because of parent reports of behaviors at home and to have a plan in place when Student transitioned to the Sixth Grade Center. Admin. Rec. N.T. at 174:2-18 (Falkner).

*See also* Admin. Rec. N.T. at 80:7-10, and at 80:20 – 81:3 (mother, discussing transition); Admin. Rec. J-22 at 26 of 62.

During 5th grade, the elementary school was not seeing the same behaviors that parents described as occurring at home.  N.T. at 183:5-22 (Falkner).  Although parents described some behaviors, such as property destruction, they made no mention of bed-wetting.  Admin. Rec. N.T. at 183:23 – 184:4, and at 184:18-21 (Falkner).

Student made progress in 5th grade with using coping strategies, remaining calm, and not expressing self-harm or "negative self-talk."  Admin. Rec. N.T. at 199:15-18 (Falkner).  "We saw a major improvement in his behavior and decrease in frequency and duration of behavior."  Admin. Rec. N.T. at 215:14-16 (Falkner).  No one had any concerns about student's academic performance.  *See, inter alia*, Admin. Rec. N.T. at 203:5-21 (Falkner).  Student was able to meet grade-level expectations in 5th grade.  Admin. Rec. N.T. at 494:22-25 (Chindemi).  Student's 5th grade report card accurately represents his performance in school.  Admin. Rec. N.T. at 496:19 – 497:3 (Chindemi).  Student was held to the same expectations as all regular education students.  Admin. Rec. N.T. at 497:16 – 498:2, at 500:2-6, at 501:16-20, and at 502:10-15 (Chindemi).  Generally, in 5th grade, Student's social behavior was typical.  Admin. Rec. N.T. at 504:25 – 505:17 (Chindemi).  Student

was able to self-advocate for his interests. Admin. Rec. N.T. at 509:4-12 (Chindemi).

Based on performance during 5th grade with Itinerant level support, there was no need to provide Supplemental support for 6th grade. Admin. Rec. N.T. at 206:22 – 207:10 (Falkner). The school team recommended Student take Support ELA at the Sixth Grade Center. Admin. Rec. N.T. at 493:12 – 494:11 (Chindemi). *See also* Admin. Rec. J-27 at 1-2 of 4.

On June 10, 2021, the IEP Team made additional changes to Student's IEP at parental request. Admin. Rec. N.T. at 81:18-22 (mother). *See* Admin. Rec. J-22 at 8 and 26 of 62. Parents wanted Student (a) to not be with a certain school counselor and (b) to be with a certain peer. Admin. Rec. N.T. at 82:14 (mother); Admin. Rec. N.T. at 178:20 – 179:8 (Falkner). Megan Busby is a guidance counselor at the Sixth Grade Center. Admin. Rec. N.T. at 348:15-16. She spoke with Student's mother the summer before 6th grade to address parents' request to not schedule Student with a certain counselor and to schedule him with a certain peer. Admin. Rec. N.T. at 353:10-24 (Busby). They worked out that Student (a) would not be assigned to the certain school counselor and (b) the school would work to schedule time with the certain peer, such as the same lunch. Admin. Rec. N.T. at 354:5-14 (Busby).

Sixth grade started in-person for all students.  Admin. Rec. N.T. at 84:10 (mother).[10]  Allison Hill was Student's 6th grade emotional support teacher.  Admin. Rec. N.T. at 223:1-6 (Hill).  Among other things, she taught him in Functional Strategies class (coping strategies, self-concept), Admin. Rec. N.T. at 227:10-22 (Hill), and Social Dynamics class (social skills), Admin. Rec. N.T. at 28:16-19 (Hill).  Other than those two classes (a total of four periods in a six-day cycle), and related services (Speech and Language Therapy, and Occupational Therapy), Student was in all regular education classes.  Admin. Rec. N.T. at 229:2-5 (Hill).

Student had some difficulties with peer interactions at the start of 6th grade, which is fairly common.  Admin. Rec. N.T. at 236:7-11 (Hill).  Ms. Busby conducted "check-ins" with Student and met with Student one time per week from the start of the year, Admin. Rec. N.T. at 356:2-22 and 455:21-25 (Busby).  On October 5, 2022, Ms. Hill reported Student's comments about self-harm.  Admin. Rec. N.T. at 236:19-23 (Hill).  *See also* Admin. Rec. N.T. at 356:22-23 and 357:13-25 (Busby, noting actions in light of Student writing he wanted to punch himself and hated everything).  Because Student answered the Youth Suicide Risk Screening Form questions as wishing he were dead, a full assessment followed.

---

[10]     The March 26, 2021 Revision IEP added COVID Compensatory Services ("CCS") with a June 14, 2021 start date.  Admin. Rec. J-21 at 42 of 51.  *See also* Admin. Rec. N.T. at 101:11-18 (mother).  Nonetheless, Plaintiff-mother testified that parents opted to not participate in CCS because they didn't know the start date soon enough.  Admin. Rec. N.T. at 79:10-16 (mother).

Admin. Rec. N.T. at 360:10-14 (Busby). *See also* Admin. Rec. J-30 at 1-2 of 10 (screener). In this instance, parents made an appointment that afternoon with Student's private therapist. Admin. Rec. N.T. at 361:4-12 (Busby). After the suicide screening, school staff met internally and then contacted parents in order to talk to Student's private therapist. Admin. Rec. N.T. at 450:24—451:18 (Busby).

After the October 5, 2022 comments, both Ms. Busby and Ms. Cello, a Prevention Specialist, met with Student, each one every alternate week. Admin. Rec. N.T. at 456:1-8 (Busby); Admin. Rec. N.T. at 478:24 – 479:6 and 16-20 (Cello). Student was also able to meet with either at any time. Admin. Rec. N.T. at 456:17-22 (Busby). The Team planned to have Student meet with both Ms. Busby and Ms. Cello so that he would get to know two trusted persons and to be able to cover any academic issues as well as mental health concerns. Admin. Rec. N.T. at 469:1-10 (Cello). *See also* Admin. Rec. J-29 at 18 of 77. Student met them both on October 6, 2022, to go over the plan for their support of him. Admin. Rec. N.T. at 471:9-25 (Cello). *See also generally* Admin. Rec. N.T. at 473:13 – 477:14 (Cello, addressing meetings with Student).

During this time, Student was showing progress with his coping skills. Admin. Rec. N.T. at 477:15-478:2 (Cello).

The IEP Team met on October 12, 2021. Parents described Student's behavior and emotional state at home, including "suicidal statements" and other

problems getting worse, Admin. Rec. N.T. at 88:1-11 (mother), attributing it to his experience at the Sixth Grade Center, Admin. Rec. N.T. at 86:6—87:18 (mother). The IEP Team added the check-in support with a prevention specialist in addition to Ms. Busby. Admin. Rec. N.T. at 368:11-13 (Busby). *See also,* Admin. Rec. J-29 at 18 of 77 (Revision IEP dated Oct. 12, 2021). The IEP Team also discussed different possible placement options. Admin. Rec. N.T. at 241:14 – 242:12 (Hill). Despite IEP revisions, parents did not see improvement by November 2021. ECF 17-1 at 41 of 45. *See also* Admin. Rec. N.T. at 88:20 – 89:1 (mother).

On October 18, 2021, Student wrote concerning statements of self-harm, which resulted in the administration of the Suicide Risk Monitoring Tool. Admin. Rec. N.T. at 364:5-13 (Busby). *See also* Admin. Rec. J-30 at 3 of 10. The school and parents switched Student to the other team in an effort to make him more comfortable. Admin. Rec. N.T. at 438:17-24 (Busby). In effect, the switch to a second team with Student's friend was to un-do parents' decision at the start of the year to place Student on one team to avoid a counselor. Admin. Rec. N.T. at 439:2-17 (Busby). Parents were offered two schedules that accomplished the switch: one would continue Student in the supported ELA class, the second would change ELA to a regular class. Parents chose the latter, Admin. Rec. N.T. 440:2-15 (Busby), which meant a switch of all of Student's classes, Admin. Rec. N.T. at

452:18 – 453:1 (Busby).  The switch occurred at the end of October 2021.  Admin. Rec. N.T. at 450:20-22 (Busby).

Although Student remained with the favored counselor after the switch, Admin. Rec. N.T. at 446:16-23 (Busby), the change could not have been at the start of the year because of Student's supported ELA class, Admin. Rec. N.T. at 461:15-25, and at 462:19 – 463:2 (Busby).

Ms. Hill did not see Student suffering a panic attack in school.  Admin. Rec. N.T. at 272:20-23.  Ms. Hill did not receive any reports of elopement from school or aggression in school.  Admin. Rec. N.T. at 272:24 – 273:4.  Ms. Hill believed the IEP was appropriate for Student as was his placement.  Admin. Rec. N.T. at 278:9-23 (Hill).

The IEP Team met on November 9, 2021 to discuss Student's mental health needs, Admin. Rec. N.T. at 255:1-10 (Hill), and addressed parents' request for cyber school, Admin. Rec. N.T. at 255:18-20 (Hill), as well as programmatic changes, and a psychiatric evaluation, Admin. Rec. N.T. at 257:9-12 (Hill); Admin. Rec. J-31 at 3 and 12 of 66 (offering psychiatric evaluation).  Per Parent request, the IEP Team made a revision for Student to start a hybrid schedule of classes through the District's cyber school and in-person classes.  Admin. Rec. N.T. at 89:20 – 90:2 (mother); Admin. Rec. N.T. at 453:25 – 454:8 and 455:1-4 (Busby).  *See also* Admin. Rec. J-31 at 12 of 66.  The School District

recommended an FBA to be conducted in the home. Admin. Rec. N.T. at 272:10-18 (Hill); Admin. Rec. N.T. at 372:7-11 (Busby). *See also,* Admin. Rec. J-29 at 9 of 27 (bottom right). Parents declined. Admin. Rec. N.T. at 287:4-8 (Hill). The School District proposed a psychiatric evaluation in response to parental concerns and to determine if the school should provide some other supports. Admin. Rec. N.T. at 242: 8-10 and 269:2-9 (Hill); Admin. Rec. N.T. at 372:7-11 (Busby). Parents declined the psychiatric evaluation, Admin. Rec. N.T. at 287:1-3 (Hill), because, counter-intuitively, Student "had deteriorated so much that we didn't think it was necessary for him to go through that type of evaluation," Admin. Rec. N.T. at 91:20-23 (mother).

Parents instead decided to place Student in private school. Admin. Rec. N.T. at 90:17-19 (mother). Parents did not report to the October 2021 IEP Team meeting that they were planning to unilaterally place Student in private school. Admin. Rec. N.T. at 276:24—277:2 (Hill). Parents did not report to the November 2021 IEP Team meeting that Student was doing "shadow days" at the private school or that they were to enroll him in the private school. Admin. Rec. N.T. at 276:11-23 (Hill). On November 15, 2021, Plaintiffs removed Student from the

School District in favor of their unilateral private placement, H.O. Dec. at 6 of 36 Stip. Fact 18, where he has remained since.[11]

The above shows more than sufficient record facts establishing that the School District properly addressed Student's known needs and parental concern. The hearing officer's decision is not in error.

**3. Plaintiffs' third issue ECF 17-1 at 5-6 of 45: the School District offered a FAPE via the November 2021 IEP and the August 2022 IEP**.

The November 2021 IEP is addressed above. The August 2022 IEP was developed in response to parents' request long after their unilateral private placement. Parents obtained a private evaluation report, which they provided to the School District on July 14, 2022. H.O. Dec. at 6 of 36 Stip. Fact 19. On August 15, 2022, parents wrote an email claiming the School District failed to provide a FAPE and demanded tuition reimbursement. H.O. Dec. at 6 of 36 Stip. Fact 20. The qualities of the August 2022 IEP are noted in the hearing officer's detailed Finding of Fact number 65.

Plaintiffs challenges the August 2022 IEP because the Team "failed to meaningfully consider" the private report. ECF 17-1 at 42 of 45. They also contend the IEP contains the same social, emotional, behavioral goals, repeated the

---

[11] Student likely continued with mental health struggles months after leaving the School District, causing Plaintiffs to inquire about a psychiatric evaluation in February 2022. Admin. Rec. J-37 (email chain). An evaluation for a found-child who is unilaterally placed by parents would be done through Act 89. 24 Pa. Cons. Stat. § 9-972.1.

same behavior plan, and placed Student in regular education for 75 percent of the day.  ECF 17-1 at 42 of 45.

The only requirement in law is to "consider" a private report provided by parents.[12]  20 U.S.C. § 1414(d)(3)(A); 34 C.F.R. § 300.502(c); *Zachary J. v. Colonial Sch. Dist.*, C.A. 22-1509, 2024 WL 366180, 2024 U.S. App. LEXIS 2187, at *9 (3d Cir. Jan. 31, 2024).  *C.f., Nack ex rel. Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 614 (6th Cir. 2006); *Maggie J. by & through Richard J. v. Donegal Sch. Dist.*, Civ.A. 20-2782, 2021 WL 2711531, at *12 (E.D. Pa. June 30, 2021).

Prior to the IEP Team meeting, the school staff considered the private report and even acted on it by obtaining more information regarding Student's reading comprehension and writing skills.  H.O. Dec. at 17 of 36 FF 63.

The August 2022 IEP notes the private report diagnoses as well as recommendations.  Admin. Rec. J-45 at 16 of 59.  Although the IEP does not repeat what is said in the reports, it puts some recommendations into action in that the private report breaks no new ground and the IEPs already addressed much of what it suggested, *e.g.*, a "go to person," instruction and goals for social, emotional, and behavioral needs.  Admin. Rec. J-43 at 3-5 of 28.  *See, e.g., Zachary J.*, Civ.A. 19-652, 2022 U.S. Dist. LEXIS 33145 at *38 (discussing

---

[12]  Pennsylvania state regulations implementing the IDEA, 22 Pa. Code Chap. 14, do not address consideration of private reports.

knowledge of matters in private report).  The private report was properly considered.

As to the goals and instruction, a side-by-side comparison reveals that it is not all the same-old same-old.  Some of the emotional behavioral goals are similar as there is no dispute that Student still needed to address appropriate peer interaction, *compare* Admin. Rec. J-31 at 39 of 66, *with* J-45 at 33 of 59; social skills in cooperative learning, *compare* Admin. Rec. J-31 at 41 of 66, *with* J-45 at 34 of 59; accept criticism and not arguing, *compare* Admin. Rec. J-31 at 43 of 66, *with* J-45 at 32 of 59.  Newly added were goals relating to non-preferred tasks, Admin. Rec. J-45 at 28 of 59; emotional response, Admin. Rec. J-45 at 30 of 59; while inferencing was added, Admin. Rec. J-45 at 35 of 59; as was figurative language, Admin. Rec. J-45 at 36 of 59; along with some academic-type goals. The IEP contained a Positive Behavior Support Plan with Crisis Plan, Admin. Rec. J-45 at 40-42 of 59, along with the proposal to conduct an FBA upon return to the School District, Admin. Rec. J-45 at 46 of 59, because an FBA needs to assess the student within the actual instructional environment, Admin. Rec. N.T. at 535:25-536:3 (Winicov).

As to placement, "[t]he parents cannot have it both ways," H.O. Dec. at 28 of 36, noting Plaintiffs previously rejected a more intensive educational environment.  The hearing officer rightly rejected the contention based on the

paucity of evidence that Student needed to be in a more restrictive setting to obtain a FAPE particularly in distinction to his attainment in the least restrictive setting. The IEPs offered many and effective services and interventions to support Student in the mainstream setting, and those were effective in supporting him. Placing him in a more restrictive setting would violate the least restrictive environment mandate. 20 U.S.C. § 1412(a)(5).

4. **Plaintiffs' fourth issue ECF 17-1 at 6 of 45: Plaintiffs are not entitled to tuition reimbursement**.

Parents who believe their public school is not providing a FAPE may unilaterally remove the child from the school, place the child in a private school, and may seek tuition reimbursement. 20 U.S.C. § 1412(a)(10)(C). *See also Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 374 (1985). Parents do so at their own financial risk. *Florence Cnty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, 15 (1993).

Parents may be entitled to tuition reimbursement only by showing that: (1) the public school violated the IDEA by failing to provide FAPE; (2) the private placement is "proper under the Act;" and (3) equities favor reimbursement. *Sch. Comm. of Town of Burlington,* 471 U.S. at 370. *See also Carter*, 510 U.S. at 15-16; *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 276 (3d Cir. 2007); 20 U.S.C. § 1412(a)(10)(C).

Plaintiffs have also not shown grounds to upset the hearing officer's equities findings. They do not contest the material fact: parents did not give statutory notice. Beyond that, Plaintiffs failed to take up multiple opportunities to tell the Team of their plan, *e.g.*, failing to disclose "shadow days" or that they signed a contract. The hearing officer also factored in parents' lack of credibility as well as their efforts to manipulate or hide information from School District decision-makers. H.O. Dec. at 31-33 of 36; H.O. Dec. at 14 of 36 FF 52, at 15 of 36 FF 54-55, at 17 of 36 FF 61, and at 18 of 36 FF 66. *See also* Admin. Rec. N.T. at 112:15-25 (mother, not answering directly); at 114:14-21 (mother, not remembering medication side effects); at 115:17 – 118:6 (mother, secretive communication with district official). Even on direct, Plaintiff-mother could not directly answer the question, when did parents begin to look into private school[13], offering instead a tangential response going back to "check-ins." N.T at 90:24 – 91:12 (mother).

Plaintiffs have not shown that the hearing officer's decision is in error. Because the School District provided and offered a FAPE, Plaintiffs are not entitled to tuition reimbursement.

---

[13] "Approximately what point in the school year did you decide that I got to start looking at other options [for schooling]?" N.T. at 90:21-23.

## III. CONCLUSION[14]

Accordingly, Defendant Downingtown Area School District respectfully requests that its motion be granted, Plaintiffs' motion be denied, and judgment entered in favor of Defendant and against Plaintiffs.

Sweet, Stevens, Katz & Williams, LLP

Date: <u>March 28, 2024</u>    By:    <u>*/s/Karl A. Romberger, Jr.*</u>
Karl A. Romberger, Jr. - PA 60636
331 East Butler Avenue; P.O. Box 5069
New Britain, Pennsylvania  18901
215-345-9111 / kromberger@sweetstevens.com

*Attorneys for Defendant,*
*Downingtown Area School District*

---

[14] Plaintiffs make reference to Section 504 of the Rehabilitation Act, P.L. 93-112, 87 Stat. 394, *as amended,* 29 U.S.C. § 794, and the Americans with Disabilities Act of 1990 ("ADA"), 104 Stat. 327, *as amended*, 42 U.S.C. § 12101 *et seq*., ECF 17-1 at 40 of 45, but make no argument distinct from their IDEA arguments.  Plaintiffs waived the Section 504 and ADA claims. *G.S.*, C.A. 21-1680, 2022 U.S. App. LEXIS 17151, at *5 n.10 (citing *Laborers' Internat'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp*., 26 F.3d 375, 398 (3d Cir. 1994)).  If not, disposing of the IDEA claims properly disposes the Section 504 and ADA claims.