IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RYAN S., by and through his parents, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Civil Action |
| v. | : | |
| | : | No. 23-3270 |
| DOWNINGTOWN AREA SCHOOL DISTRICT, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**MEMORANDUM**

**J. Younge**                                                                                             **June 10, 2024**

## I.   INTRODUCTION

Currently before this Court are the Parties' respective Motions for Judgment on the Administrative Record.  (ECF No. 17 & 18.)[1]  The Court finds these Motions appropriate for resolution without oral argument.  Fed. R. Civ. P. 78; L.R. 7.1(f).  For the reasons set forth in this Memorandum, Defendant's Motion for Judgment on the Administrative Record (ECF No. 18) is Granted.  Accordingly, Plaintiffs' Motion (ECF No. 17) is Denied.

## II.   FACTUAL BACKGROUND

Ryan S., a minor student with disabilities, including Autism, Generalized Anxiety Disorder, Unspecified Depressive Disorder, and Attention Deficit Hyperactivity Disorder, attended school in the Downingtown Area School District from kindergarten until the middle of sixth grade.  (Complaint ¶¶ 1-3, ECF No. 1.)  He is currently fourteen years old.  (Hearing Officer Decision (hereinafter "HO Dec."), ECF No. 4-3, p. 4.)  Midway through sixth grade, the

---

[1] When applicable, the Court adopts the pagination supplied by the CM/ECF docketing system, which does not always match the document's internal pagination.

1

student was removed from Defendant's public school and enrolled at a private school by his parents. (*Id.* at 4, 6.)

From the beginning of 2020, during the student's fourth grade year, until his removal from public school in November 2021, there were eight annual Individualized Education Program (hereinafter "IEP") or IEP revision meetings held. (*Id.* at 5.) In 2020, the annual IEP meeting, held in early January, was revised that December. (*Id.*) In 2021, the annual IEP meeting was followed by five revisions, prompted by and addressing the student's references to self-harm and suicidal ideation and, generally, a need for increased coping strategies. (*Id.* at 5-9.)

Following a return to in-person classes after the height of COVID-19-related school closures on October 26, 2020, the parents requested a crisis assessment for the student in response to concerns about self-harm. (*Id.* at 7-8.) A Suicide Severity Rating Scale was conducted on November 18, 2020. (*Id.* at 8.) On December 11, 2020, the student's IEP was adjusted accordingly to provide additional supports to the student, including regular meetings with a prevention specialist. (*Id.*) On January 5, 2021, the student's IEP was further adjusted to include a crisis plan and extra check-ins for emotional support and counseling. (*Id.* at 9.) The student's IEP was revised again on January 25, 2021, in response to concerns that the student was exhibiting behavioral problems at home that were not seen in school, and now included a positive behavior support plan. (*Id.*) Following an evaluation of the student's social skills, which markedly regressed during the COVID-19 pandemic, and his speech and occupational therapy, the IEP was revised again on March 26, 2021, to include additional instruction in all three categories. (*Id.* at 9-10.) The student's IEP was revised for the last time as a fifth-grade student on May 21, 2021, after assessing the student's progress during the previous school year

and in preparation for sixth grade. (*Id.* at 10.) Due to the student's progress in meeting his emotional and behavioral targets, the IEP was adjusted to require a weekly communication log rather than daily charts. (*Id.*) Hearing Officer James Gerl noted that the student had made progress towards his goals throughout fifth grade. (*Id.* at 9-10.)

The parent's sought another IEP revision in anticipation of sixth grade: that a certain peer be included in the student's class and that the student be able to avoid a certain guidance counselor. (*Id.* at 10-11.) The parents were informed in August 2021 that only one or the other request could be accommodated because the other child's schedule could not be changed. (*Id.* at 11.) The parents chose for the student to avoid that counselor. (*Id.*) During the beginning of sixth grade, the student met with his counselor regarding his transition. (*Id.* at 12.) Following a suicide risk screening on October 5, 2021, the student began meeting regularly with his counselor and a prevention specialist. (*Id.* at 12-13.) On October 12, 2021, the student's IEP was revised to allow for the parent's requested scheduled change to avoid students that he did not get along with. (*Id.* at 13-14.) Prior to the schedule change being implemented on October 27, 2021, the student reported an incident of bullying and a second suicide risk screening was conducted. (*Id.*)

On November 10, 2021, the student's IEP team met, and the parents asked that the student be able to attend a cyber academy part time because the student did not want to come to school. (*Id.* at 14.) The IEP team recommended an at-home functional behavioral analysis that would allow for the identification of strategies to encourage the student to come to school. (*Id.*) The parents refused. (*Id.* at 14-15.) On the same day, without the school district's knowledge, the student was attending a shadow day at a private school. (*Id.* at 15.) The student was formally enrolled on November 12, 2021. (*Id.*)

The parents retained experts in March and April 2022 to assess the student on the Kaufman Achievement Test and to observe him in the classroom of the private school. (*Id.* at 15-16.) During the same period, the parents officially enrolled the student in the private school for the 2022-2023 school year. (*Id.* at 17.) The parents informed the school district that they did not believe it had offered an appropriate education to the student. (*Id.*) At the final IEP team meeting on August 22, 2022, the team reviewed the expert's evaluation and developed strategies for improving his social and functional skills. (*Id.* at 18.) The parents did not share any concerns about the IEP. (*Id.*)

Based on this record, Officer Gerl determined that Plaintiffs had not shown that Defendant Downingtown Area School District failed to provide a free and appropriate education for the student and, therefore, Defendant was not obligated to reimburse Plaintiffs for private school tuition or for the cost of the private evaluation. (*Id.* at 23-24.) Officer Gerl specifically pointed to the school district's repeated modifications, the provision of additional supports and check-ins when the student demonstrated behavioral or emotional regression, and continued progress academically and on his IEP goals. (*Id.* at 24-26.) Accordingly, Officer Gerl rejected the Plaintiffs' argument that the student's social, emotional, and behavioral needs were not properly addressed. (*Id.* at 27.) Notably, Officer Gerl found the school district witnesses "more credible and persuasive" than the student's mother and the Plaintiffs' expert witness because he found that the mother was evasive, had "very poor memory," and was contradictory and that the expert witness had only reviewed information provided by the Plaintiffs. (*Id.* at 29-30.) Additionally, Officer Gerl found that the parents had failed to provide the required statutory notice before removing the student from school. (*Id.* at 31.)

Plaintiffs filed an administrative due process complaint with the Pennsylvania Department of Education's Office for Dispute Resolution on October 24, 2022. (Complaint ¶ 14, ECF No. 1.) On May 25, 2023, following a due process hearing conducted on February 17, 2023 and April 3, 2023, Officer Gerl found in favor of the Defendant, concluding that the student had received appropriate IEPs from the school district, that the equities disfavor reimbursement of the private school tuition, and that the school should not be required to reimburse the parents for the cost of a private evaluation by their expert witness. (HO Dec., ECF No. 4-3; Complaint ¶¶ 15, 17, ECF No. 1.) Plaintiffs filed a complaint against the Defendant on August 23, 2023, for failure to provide a free and appropriate public education in violation of the Individuals with Disabilities Education Act (hereinafter "IDEA"), 20 U.S.C. § 1400, *et seq.*, the Rehabilitation Act of 1973, 29 U.S.C. § 794, the Americans with Disabilities Act of 1990, 42 U.S.C. § 12102, *et seq.*, and Chapters 14 and 15 of the Pennsylvania Code. (Complaint, ECF No. 1.) Plaintiffs filed their Motion for Judgment on the Administrative Record on February 29, 2024. (ECF No. 17.) Defendant filed its competing Motion for Judgment on the Administrative Record on March 28, 2024. (ECF No. 18.)

### III.   LEGAL STANDARD

An appeal of an IDEA decision in the district court is subject to a modified *de novo* review. *S.H. v. State-Operated Sch. Dist. of the City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003). The district court's review is plenary "except that it is required to defer to the hearing officer's credibility determinations unless non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." *Carlisle Area School v. Scott P. By and Through Bess P.*, 62 F.3d 520, 524 (3d Cir. 1995). While the district court may make an independent decision, it must give the

hearing officer's determinations "due weight." *Id.* "Due weight" means "[f]actual findings from the administrative proceedings are to be considered prima facie correct." *S.H.*, 336 F.3d at 270. The party bringing the administrative complaint bears the burden of proof. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49 (2005).

IV.     **DISCUSSION**

The IDEA requires school districts to evaluate students with disabilities at least every three years to assess them "in all areas related to the suspected disability" so as to identify their related service needs. 34 C.F.R. §§ 300.303(b)(2), 300.304(c)(4)-(6). This evaluation is used to develop an IEP for each student at the start of the school year which provides a free and appropriate public education. 20 U.S.C. § 1414(d)(2)(A). This applies to all disabled students residing in the school district who are either enrolled or seeking re-enrollment. *I.H. v. Cumberland Valley Sch. Dist.*, 842 F. Supp. 2d 762, 772-73 (M.D. Pa. 2012).

    A.     **The Decision Was Fair and Impartial.**

Plaintiffs' contention that the hearing was not fair and impartial due to the time constraints placed on witness testimony is without merit. Due process requires a fair and impartial hearing and decision. 34 C.F.R. § 300.511. Standard practice for such hearings is that each party is allotted one hour to question each witness. *See* Uniform Prehearing Directions, "Hearing Duration and Witness Time Allotments" (Feb. 2020 Update), at p. 6, available at https://odr-pa.org/wp-content/uploads/Prehearing-Directions.pdf. However, where there is a report prepared by a testifying witness that is offered as an exhibit, that exhibit may be accepted by the Hearing Officer as the author's direct testimony and direct examination of that author may be limited to questioning that "establish[es] the report's evidentiary weight or relevance, or that help[s] the Hearing Officer understand the report." *See id.*, "Reports as Evidence," at p. 5.

6

Here, Plaintiffs' expert report was admitted into the record and the expert witness's direct testimony was accordingly limited to ten minutes because, as the Hearing Officer stated, "[u]nless they are ambiguous or unclear or need to be explained in some way, they speak to [*sic*] themselves and I prefer not to have witnesses read them to me." (Admin. Rec. N.T. at 13:14-22, ECF No. 4-7.) All other witnesses, who did not have such reports, were afforded the standard hour for questioning. Plaintiffs offer nothing beyond the time limitation imposed on their expert's testimony, which is contemplated in the rules, to suggest that the Hearing Officer diverted from standard practice, as alleged. As the hearing was conducted in accordance with the relevant general rules, this Court cannot find that it was unfair or partial.

Plaintiffs also point to factual findings that they allege are indicative of bias against their position. Their arguments are unavailing. First, they suggest that the Hearing Officer's factual determination that the expert had not observed the student at the school district or considered any records other than those provided by the Plaintiffs made the proceeding unfair. (Complaint ¶ 196, ECF No. 1.) To the contrary, making factual determinations that help parse out a witness's credibility and the relative weight of their testimony falls squarely within the Hearing Officer's role. *Carlisle*, 62 F.3d at 524. Likewise, the Hearing Officer's factual determination that certain issues were more prevalent at home versus in school, something relevant to whether the IEPs put in place at school were reasonably calculated to address the student's unique needs, does not make the proceeding unfair simply because it weighed against the Plaintiffs' argument. Notably, Plaintiffs have not contested the truth of the Hearing Officer's determinations.

Plaintiffs also suggest that the use of the term "negative self-talk" to refer to the student's suicidal ideation and mental and emotional health concerns is indicative of bias (Complaint ¶ 195); the Court is not convinced by the contention that the use of softer language either

7

downplays their concerns or made the proceeding unfair, particularly as the record indicates that all parties involved took these concerns seriously and repeatedly addressed them. Plaintiffs' concern with broad record citations also does not indicate that the Hearing Officer's decision was improper, particularly given the significant support for his findings that are present in the record. In assessing Plaintiffs' arguments regarding the fairness of the proceeding, the Court does not find anything to suggest that the proceeding or the decision reached resulted from any observable unfairness or partiality.

### B. The Record Evidence Supports the Hearing Officer's Decision.

Officer Gerl's determination that the school district provided the student with appropriate IEPs and therefore had not failed to provide a free and appropriate public education to the student is supported by the record and shall be left undisturbed. A parent may file a due process complaint against a school district for failure to provide a free and appropriate public education in violation of the IDEA. *See* IDEA § 615(b)(6)(A); 34 C.F.R. § 300.507; 22 Pa. C.S. § 14.62. To establish that a school district has failed to provide a free and appropriate public education, there must be an evaluation as to whether the school district has met the procedural safeguards set forth in IDEA and as to whether the IEP is "reasonably calculated to enable a student to make progress appropriate in light of the student's circumstances." *Endrew F by Joseph F v. Douglass Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017). IEPs are required to be reasonable, though they are not required to maximize a student's potential or to create equal outcomes. *Id.* at 398. However, providing educational benefits that are "merely more than *de minimis*" is insufficient. *Board of Educ. of Hendrick Hudson Central Sch. Dist., Westchester Cnty, et al. v. Rowley*, 458 U.S. 176, 179 (1982). Additionally, the courts "must accord significant deference to the choices made by school officials." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 277 (3d Cir. 2012).

A parent may seek reimbursement[2] for tuition resulting from private school placement based on a school district's failure to provide a free and appropriate public education. *Lester H. v. Gilhool*, 916 F.2d 865, 872 (3d Cir. 1990); 20 U.S.C. § 1412(5); 34 C.F.R. §§ 300.132, 300.227, 300.307(b), 300.347.  This requires that the parent prove that (1) the school district denied the student a free and appropriate public education, (2) that the private school placement is appropriate, and (3) that equitable factors do not preclude relief. *Sch. Comm. Town of Burlington v. Dept. of Educ.*, 471 U.S. 359, 368-70 (1985); *Lester H.*, 916 F.2d at 873. However, tuition reimbursement can be reduced or denied if the parents did not give notice of their concerns and intention to enroll the student in a private school at public expense within ten business days prior to removal. 34 C.F.R. § 300.148(d)(1)(ii); IDEA § 612(a)(10)(C). Additionally, an independent evaluation can be requested at public expense where a parent disagrees with a school district evaluation. IDEA § 615(d)(2)(A); 34 C.F.R. § 300.502(b)(1).

Here, the school district has demonstrated that it provided to the student an appropriate public education with reasonably calculated, and repeatedly modified, IEPs that addressed the student's unique and changing needs. Plaintiffs argue that the IEPs were insufficient to support the student as he suffered from ongoing social, emotional, and behavioral issues, necessitating his removal to a more appropriate school. (Complaint, ECF No. 1.)  The Court does not doubt the suitability of the private school the student is currently enrolled in and notes that Officer Gerl agreed that the student has been making progress at his new school. (HO Dec., ECF No. 4-3, pp. 30-31.)  However, an analysis of whether the Defendant provided a free and appropriate public

---

[2] Such reimbursement may also be available under Section 504 and the ADA provided that the student was denied a free and appropriate public education. 34 C.F.R. § 104.33(a); *Jeremy H. v. Mount Lebanon Sch. Dist.*, 95 F.3d 272, 279 (3d Cir. 1996).

9

education is not based on preference or what would be the most ideal environment for the student but rather the appropriateness of the IEPs themselves.

Defendant made repeated adjustments to the student's IEP that were responsive to his unique concerns and calculated to help the student better navigate school, his emotions, and his social interactions. Following the resumption of in-person learning in the Fall of 2020 and concerns about the student's emotional health, a suicide prevention screening was conducted, and the student's IEP was revised to increase communication and monitoring of the student's mental health and to require weekly meetings with a Prevention Specialist. (11/30/20 IEP Update, ECF No. 4-8, p. 344; 12/11/20 IEP Revision, ECF No. 4-8, p. 331; 11/18/20 Columbia-Suicide Severity Scale Rating, ECF No. 4-8, pp. 325-329; 11/11/20 Notice for a Reevaluation, ECF No. 4-8, pp. 236-240.) Following a reevaluation report that noted concerns about his social skills, mental health, and English Language Arts skills, the school conducted tests to identify his needs. (12/21/20 Reevaluation Report, ECF No. 4-8, pp. 394, 404-413.) The student's IEP was subsequently revised to include a crisis plan and continued meetings with a Prevention Specialist. (1/5/21 IEP Revision, ECF No. 4-8, 462-463.)

Prior to the student's formal withdrawal from the public school, there were five more IEP revisions that considered and adjusted to provide further support for the student's social skills regression during the COVID-19 pandemic, his mental and emotional health, and potential bullying. (*See e.g.*, J-18, J-19, J-21, J-22, J-29 & J-31, ECF No. 4-8.) The record demonstrates that such evaluations and recommended solutions were thorough, included assessments of progress and concerns from multiple observers, identified considerable and relatively consistent progress towards the student's goals, and were responsive to areas of concern, particularly the

student's emotional health.[3]  The record further reflects that there was detailed and ongoing evaluation and reevaluation of the student's needs and the best ways to address them.  While the IEPs may not have provided the ideal learning environment for the student, the Court agrees with Officer Gerl that they were reasonably calculated to the student's needs and goals and were thus appropriate.  *See Rowley*, 458 U.S. at 204 (finding that an IEP is appropriate if "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade"); *Jana K. ex rel. Tim K. v. Annville-Cleona Sch. Dist.*, 39 F. Supp. 3d 584, 604 (M.D. Pa. 2014) (noting that an effective IEP provides "accountability, measurable goals, and progress monitoring").  Furthermore, the Court notes that the parents did not provide the necessary statutory notice prior to formally removing the student from the school district.  34 C.F.R. § 300.148(d)(1)(ii); IDEA § 612(a)(10)(C).

Since the Defendant provided a free and appropriate public education, and therefore did not violate the IDEA or its related obligations, Plaintiffs cannot establish that they are entitled to tuition reimbursement.  *Sch. Comm. Town of Burlington*, 471 U.S. at 370.  Additionally, as there is no evidence to suggest that the parents expressed disagreement with a school district

---

[3] For example, a June 2021 IEP Revision noted progress towards his speech/language, emotional self-regulation, peer cooperation, and occupational therapy goals, even while adding additional supports for social skill development due to regression during the COVID-19-related school closure.  (ECF No. 4-8, pp. 590, 592-93, 606-10, 618.)  During the October 2021 IEP Revision, the IEP team considered and implemented multiple additional supports to aid the student's transition into sixth grade and based their decisions not to implement other options on the student's individual needs.  (ECF No. 4-8, pp. 786-91, 806.)  The August 2022 IEP notes the information provided by the private evaluation, added additional goals for the student, and proposes that a functional behavior analysis be conducted if the student returned to the school district.  (ECF No. 4-8, pp. 985, 997-999, 1004-1005 & 1015.)  These examples are non-exhaustive, as each report provides observational analyses of the student's progress on certain behaviors and his emotional health and seeks to address any newly-arising concerns.

evaluation or had requested that the school district pay for them to conduct a private evaluation, Plaintiffs cannot establish that they are titled for such reimbursement.

## V.       CONCLUSION

For the foregoing reasons, Defendant's Motion for Judgment on the Administrative Record is Granted.  Plaintiff's competing Motion is accordingly Denied.

An appropriate Order follows.

**IT IS SO ORDERED.**

                                             BY THE COURT:

                                             /s/ John Milton Younge
                                             **Judge John Milton Younge**